# BRONSTON *v.* UNITED STATES

No. 71–1011.   Argued November 15, 1972—
Decided January 10, 1973

BURGER, C. J., delivered the opinion for a unanimous Court.

*Sheldon H. Elsen* argued the cause for petitioner. With him on the briefs were *Lewis Shapiro* and *John S. Martin, Jr.*

*Andrew L. Frey* argued the cause for the United States. With him on the brief were *Solicitor General Griswold, Assistant Attorney General Petersen, Beatrice Rosenberg,* and *Marshall Tamor Golding.*

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted the writ in this case to consider a narrow but important question in the application of the federal perjury statute, 18 U. S. C. § 1621:[1] whether a witness

---

[1] 18 U. S. C. § 1621 provides:

"Whoever, having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare,

may be convicted of perjury for an answer, under oath, that is literally true but not responsive to the question asked and arguably misleading by negative implication.

Petitioner is the sole owner of Samuel Bronston Productions, Inc., a company that between 1958 and 1964, produced motion pictures in various European locations. For these enterprises, Bronston Productions opened bank accounts in a number of foreign countries; in 1962, for example, it had 37 accounts in five countries. As president of Bronston Productions, petitioner supervised transactions involving the foreign bank accounts.

In June 1964, Bronston Productions petitioned for an arrangement with creditors under Chapter XI of the Bankruptcy Act, 11 U. S. C. § 701 *et seq.* On June 10, 1966, a referee in bankruptcy held a § 21 (a) hearing to determine, for the benefit of creditors, the extent and location of the company's assets.[2] Petitioner's perjury

---

depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true, is guilty of perjury, and shall, except as otherwise expressly provided by law, be fined not more than $2,000 or imprisoned not more than five years, or both. This section is applicable whether the statement or subscription is made within or without the United States."

[2] Under § 334 of the Bankruptcy Act, 11 U. S. C. § 734, the court must hold a first meeting of creditors within a limited period of time after the Chapter XI petition is filed. Section 336, 11 U. S. C. § 736, provides that the judge or court-appointed referee shall preside at the meeting and "shall examine the debtor or cause him to be examined and hear witnesses on any matter relevant to the proceeding."

Section 21 (a) of the Act, 11 U. S. C. § 44 (a), is applicable to a Chapter XI proceeding because it is a provision of Chapters I through VII "not inconsistent with or in conflict with the provisions of [Chapter XI]." 11 U. S. C. § 702. Section 21 (a) provides, in pertinent part, that "[t]he court may, upon application of any officer, bankrupt, or creditor, by order require any designated

conviction was founded on the answers given by him as a witness at that bankruptcy hearing, and in particular on the following colloquy with a lawyer for a creditor of Bronston Productions:

> "Q. Do you have any bank accounts in Swiss banks, Mr. Bronston?
>
> "A. No, sir.
>
> "Q. Have you ever?
>
> "A. The company had an account there for about six months, in Zurich.
>
> "Q. Have you any nominees who have bank accounts in Swiss banks?
>
> "A. No, sir.
>
> "Q. Have you ever?
>
> "A. No, sir."

It is undisputed that for a period of nearly five years, between October 1959 and June 1964, petitioner had a personal bank account at the International Credit Bank in Geneva, Switzerland, into which he made deposits and upon which he drew checks totaling more than $180,000. It is likewise undisputed that petitioner's answers were literally truthful. (a) Petitioner did not at the time of questioning have a Swiss bank account. (b) Bronston Productions, Inc., did have the account in Zurich described by petitioner. (c) Neither at the time

---

persons . . . to appear before the court . . . to be examined concerning the acts, conduct, or property of a bankrupt." Numerous statements of the broad scope of a § 21 (a) inquiry are collected in 2 W. Collier, Bankruptcy ¶ 21.11 (14th ed. 1971). The officers of a bankrupt may be required to undergo a § 21 (a) examination even if they are not still officers at the time of filing. *Id.,* ¶ 21.09. If it appears that the interest of a witness is adverse to the party calling him to testify, under § 21 (j), 11 U. S. C. § 44 (j), the party may examine the witness as if under cross-examination, and the examining party is not bound by the witness' testimony. 1A W. Collier, Bankruptcy ¶ 5.22 (14th ed. 1972).

of questioning nor before did petitioner have nominees who had Swiss accounts. The Government's prosecution for perjury went forward on the theory that in order to mislead his questioner, petitioner answered the second question with literal truthfulness but unresponsively addressed his answer to the company's assets and not to his own—thereby implying that he had no personal Swiss bank account at the relevant time.

At petitioner's trial, the District Court instructed the jury that the "basic issue" was whether petitioner "spoke his true belief." Perjury, the court stated, "necessarily involves the state of mind of the accused" and "essentially consists of wilfully testifying to the truth of a fact which the defendant does not believe to be true"; petitioner's testimony could not be found "wilfully" false unless at the time his testimony was given petitioner "fully understood the questions put to him but nevertheless gave false answers knowing the same to be false." The court further instructed the jury that if petitioner did not understand the question put to him and for that reason gave an unresponsive answer, he could not be convicted of perjury. Petitioner could, however, be convicted if he gave an answer "not literally false but when considered in the context in which it was given, nevertheless constitute[d] a false statement."[3]

---

[3] The District Court gave the following example "as an illustration only":

"[I]f it is material to ascertain how many times a person has entered a store on a given day and that person responds to such a question by saying five times when in fact he knows that he entered the store 50 times that day, that person may be guilty of perjury even though it is technically true that he entered the store five times."

The illustration given by the District Court is hardly comparable to petitioner's answer; the answer "five times" is responsive to the hypothetical question and contains nothing to alert the questioner that he may be sidetracked. See *infra*, at 358. Moreover, it is very

The jury began its deliberations at 11:30 a. m. Several times it requested exhibits or additional instructions from the court, and at one point, at the request of the jury, the District Court repeated its instructions in full. At 6:10 p. m., the jury returned its verdict, finding petitioner guilty on the count of perjury before us today and not guilty on another charge not here relevant.

In the Court of Appeals, petitioner contended, as he had in post-trial motions before the District Court, that the key question was imprecise and suggestive of various interpretations. In addition, petitioner contended that he could not be convicted of perjury on the basis of testimony that was concededly truthful, however unresponsive. A divided Court of Appeals held that the question was readily susceptible of a responsive reply and that it adequately tested the defendant's belief in the veracity of his answer. The Court of Appeals further held that, "[f]or the purposes of 18 U. S. C. § 1621, an answer containing half of the truth which also constitutes a lie by negative implication, when the answer is intentionally given in place of the responsive answer called for by a proper question, is perjury." 453 F. 2d 555, 559. In this Court, petitioner renews his attack on the specificity of the question asked him and the legal sufficiency of his answer to support a conviction for perjury. The problem of the ambiguity of the question is not free from doubt, but we need not reach that issue.

_____

doubtful that an answer which, in response to a specific quantitative inquiry, baldly understates a numerical fact can be described as even "technically true." Whether an answer is true must be determined with reference to the question it purports to answer, not in isolation. An unresponsive answer is unique in this respect because its unresponsiveness by definition prevents its truthfulness from being tested in the context of the question—unless there is to be speculation as to what the unresponsive answer "implies." See *infra,* at 359.

Even assuming, as we do, that the question asked petitioner specifically focused on petitioner's personal bank accounts, we conclude that the federal perjury statute cannot be construed to sustain a conviction based on petitioner's answer.

The statute, 18 U. S. C. § 1621, substantially identical in its relevant language to its predecessors for nearly a century, is "a federal statute enacted in an effort to keep the course of justice free from the pollution of perjury." *United States* v. *Williams,* 341 U. S. 58, 68 (1951). We have held that the general federal perjury provision is applicable to federal bankruptcy proceedings. *Hammer* v. *United States,* 271 U. S. 620 (1926). The need for truthful testimony in a § 21 (a) bankruptcy proceeding is great, since the proceeding is "a searching inquiry into the condition of the estate of the bankrupt, to assist in discovering and collecting the assets, and to develop facts and circumstances which bear upon the question of discharge." *Travis* v. *United States,* 123 F. 2d 268, 271 (CA10 1941). Here, as elsewhere, the perpetration of perjury "well may affect the dearest concerns of the parties before a tribunal. . . ." *United States* v. *Norris,* 300 U. S. 564, 574 (1937).

There is, at the outset, a serious literal problem in applying § 1621 to petitioner's answer. The words of the statute confine the offense to the witness who "willfully . . . states . . . any material matter which he does not believe to be true." Beyond question, petitioner's answer to the crucial question was not responsive if we assume, as we do, that the first question was directed at personal bank accounts. There is, indeed, an implication in the answer to the second question that there was never a personal bank account; in casual conversation this interpretation might reasonably be drawn. But we are not dealing with casual conversation and the statute does not make it a criminal act for a witness to willfully

state any material matter that *implies* any material matter that he does not believe to be true.[4]

The Government urges that the perjury statute be construed broadly to reach petitioner's answer and thereby fulfill its historic purpose of reinforcing our adversary factfinding process. We might go beyond the precise words of the statute if we thought they did not adequately express the intention of Congress, but we perceive no reason why Congress would intend the drastic sanction of a perjury prosecution to cure a testimonial mishap that could readily have been reached with a single additional question by counsel alert—as every examiner ought to be—to the incongruity of petitioner's unresponsive answer. Under the pressures and tensions of interrogation, it is not uncommon for the most earnest witnesses to give answers that are not entirely responsive. Sometimes the witness does not understand the question, or may in an excess of caution or apprehension read too much or too little into it. It should come as no surprise that a participant in a bankruptcy proceeding may have something to conceal and consciously tries to do so, or that a debtor may be embarrassed at his plight and yield information reluctantly. It is the responsibility of the lawyer to probe; testimonial interrogation, and cross-examination in particular, is a probing, prying, pressing form of inquiry. If a witness evades, it is the lawyer's responsibility to recognize the evasion and to bring the witness back to

---

[4] Petitioner's answer is not to be measured by the same standards applicable to criminally fraudulent or extortionate statements. In that context, the law goes "rather far in punishing intentional creation of false impressions by a selection of literally true representations, because the actor himself generally selects and arranges the representations." In contrast, "under our system of adversary questioning and cross-examination the scope of disclosure is largely in the hands of counsel and presiding officer." A. L. I. Model Penal Code § 208.20, Comment (Tent. Draft No. 6, 1957, p. 124).

the mark, to flush out the whole truth with the tools of adversary examination.

It is no answer to say that here the jury found that petitioner intended to mislead his examiner. A jury should not be permitted to engage in conjecture whether an unresponsive answer, true and complete on its face, was intended to mislead or divert the examiner; the state of mind of the witness is relevant only to the extent that it bears on whether "he does not believe [his answer] to be true." To hold otherwise would be to inject a new and confusing element into the adversary testimonial system we know. Witnesses would be unsure of the extent of their responsibility for the misunderstandings and inadequacies of examiners, and might well fear having that responsibility tested by a jury under the vague rubric of "intent to mislead" or "perjury by implication." The seminal modern treatment of the history of the offense concludes that one consideration of policy overshadowed all others during the years when perjury first emerged as a common-law offense: "that the measures taken against the offense must not be so severe as to discourage witnesses from appearing or testifying." Study of Perjury, reprinted in Report of New York Law Revision Commission, Legis. Doc. No. 60, p. 249 (1935). A leading 19th century commentator, quoted by Dean Wigmore, noted that the English law "throws every fence round a person accused of perjury," for

> "the obligation of protecting witnesses from oppression, or annoyance, by charges, or threats of charges, of having borne false testimony, is far paramount to that of giving even perjury its deserts. To repress that crime, prevention is better than cure: and the law of England relies, for this purpose, on the means provided for detecting and exposing the crime at the moment of commission,—such as publicity,

cross-examination, the aid of a jury, etc.; and on the infliction of a severe, though not excessive punishment, wherever the commission of the crime has been clearly proved." W. Best, Principles of the Law of Evidence § 606 (C. Chamberlayne ed. 1883). See J. Wigmore, Evidence 275–276 (3d ed. 1940). Addressing the same problem, Montesquieu took as his starting point the French tradition of capital punishment for perjury and the relatively mild English punishment of the pillory. He thought the disparity between the punishments could be explained because the French did not permit the accused to present his own witnesses, while in England "they admit of witnesses on both sides, and the affair is discussed in some measure between them; consequently false witness is there less dangerous, the accused having a remedy against the false witnesses, which he has not in France." Montesquieu, The Spirit of the Laws, quoted in Study of Perjury, *supra,* p. 253.

Thus, we must read § 1621 in light of our own and the traditional Anglo-American judgment that a prosecution for perjury is not the sole, or even the primary, safeguard against errant testimony. While "the lower federal courts have not dealt with the question often," and while their expressions do not deal with unresponsive testimony and are not precisely in point, "it may be said that they preponderate against the respondent's contention." *United States* v. *Norris,* 300 U. S., at 576. The cases support petitioner's position that the perjury statute is not to be loosely construed, nor the statute invoked simply because a wily witness succeeds in derailing the questioner—so long as the witness speaks the literal truth. The burden is on the questioner to pin the witness down to the specific object of the questioner's inquiry. *United States* v. *Wall,* 371 F. 2d 398 (CA6 1967); *United States* v. *Slutzky,* 79 F. 2d 504 (CA3

1935); *Galanos* v. *United States,* 49 F. 2d 898 (CA6 1931); *United States* v. *Cobert,* 227 F. Supp. 915 (SD Cal. 1964).

The Government does not contend that any misleading or incomplete response must be sent to the jury to determine whether a witness committed perjury because he intended to sidetrack his questioner. As the Government recognizes, the effect of so unlimited an interpretation of § 1621 would be broadly unsettling. It is said, rather, that petitioner's testimony falls within a more limited category of intentionally misleading responses with an especially strong tendency to mislead the questioner. In the federal cases cited above, the Government tells us the defendants gave simple negative answers "that were both entirely responsive and entirely truthful . . . . In neither case did the defendant—as did petitioner here—make affirmative statements of one fact that in context constituted denials by negative implication of a related fact." Thus the Government isolates two factors which are said to require application of the perjury statute in the circumstances of this case: the unresponsiveness of petitioner's answer and the affirmative cast of that answer, with its accompanying negative implication.

This analysis succeeds in confining the Government's position, but it does not persuade us that Congress intended to extend the coverage of § 1621 to answers unresponsive on their face but untrue only by "negative implication." Though perhaps a plausible argument can be made that unresponsive answers are especially likely to mislead,[5] any such argument must,

---

[5] Arguably, the questioner will assume there is some logical justification for the unresponsive answer, since competent witnesses do not usually answer in irrelevancies. Thus the questioner may conclude that the unresponsive answer is given only because it is intended to make a statement—a negative statement—relevant to the ques-

we think, be predicated upon the questioner's being aware of the unresponsiveness of the relevant answer. Yet, if the questioner is aware of the unresponsiveness of the answer, with equal force it can be argued that the very unresponsiveness of the answer should alert counsel to press on for the information he desires. It does not matter that the unresponsive answer is stated in the affirmative, thereby implying the negative of the question actually posed; for again, by hypothesis, the examiner's awareness of unresponsiveness should lead him to press another question or reframe his initial question with greater precision. Precise questioning is imperative as a predicate for the offense of perjury.

It may well be that petitioner's answers were not guileless but were shrewdly calculated to evade. Nevertheless, we are constrained to agree with Judge Lumbard, who dissented from the judgment of the Court of Appeals, that any special problems arising from the literally true but unresponsive answer are to be remedied through the "questioner's acuity" and not by a federal perjury prosecution.

*Reversed.*

---

tion asked. In this case, petitioner's questioner may have assumed that petitioner denied having a personal account in Switzerland; only this unspoken denial would provide a logical nexus between inquiry directed to petitioner's personal account and petitioner's adverting, in response, to the company account in Zurich.