358 So.2d 1209 (1978)
STATE of Louisiana
v.
Rosario OCCHIPINTI.
No. 60666.
Supreme Court of Louisiana.
March 6, 1978.
On Rehearing May 22, 1978.
Larry P. Boudreaux, Boudreaux & Clement, Thibodaux, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Francis Dugas, Dist. Atty., John J. Erny, Jr., Asst. Dist. Atty., for plaintiff-appellee.
DENNIS, Justice.
Defendant was convicted of perjury, La. R.S. 14:123, in a trial without jury and sentenced to serve two years at hard labor. Defendant appeals, relying upon two assignments of error for reversal of his conviction and sentence.
ASSIGNMENT OF ERROR NO. 1
Defendant, Rosario Occhipinti, testified as a defense witness on March 5, 1975 in the burglary trial of Joseph Cappo.[1] During the trial, both Cappo and Occhipinti were portrayed by the State's principal witness, Robert Tallent, as participants with him in a conspiracy organized to plan and execute burglaries in Lafourche Parish. Tallent testified that although they had not physically participated in the offenses with him, Occhipinti and Cappo had been involved in gathering information and in planning the crimes. Tallent claimed that Occhipinti was thus implicated in crimes committed during a period from December of 1972 to July of 1973. In his testimony Occhipinti contradicted these allegations by denying that he ever planned any crimes with Tallent or Cappo and by asserting that he had been engaged in managing a motel on a full *1210 time basis in Pascagoula, Mississippi during a substantial portion of this time. In fact, Occhipinti testified, he was in Pascagoula "twenty-four hours a day" from February, 1973, to January, 1974.
Defendant now concedes that, in truth, he did not move from New Orleans to Pascagoula until April, 1973, and that even after moving there he was absent from Pascagoula many times during the period specified in his testimony. Furthermore, he does not dispute the principle that false testimony which impeaches the credibility of a witness as to a material issue is always material.[2] Defendant's argument is simply that his false testimony did not contradict that of Tallent or attack his credibility. Our inquiry, therefore, is directed toward whether the testimony of defendant in question had contradictory impeaching value or tended to show that Tallent had erred or falsified as to certain material facts. See, C. McCormick, Evidence, § 47 (Cleary ed. 1972).
The majority rule is that materiality of false testimony is a matter of law for determination by the court, rather than a factual question to be decided by the jury.[3] Therefore, our scope of review is not limited to an examination of the record to determine whether there was "some evidence" from which the trier of fact could have concluded that the false testimony was material, but is instead directed toward an independent decision on the question of law of materiality.[4] After such an independent analysis, we conclude, for the reasons set forth below, that the trial court correctly determined that the false testimony was material and that the State had met its burden of proving this essential element of the crime.
During the burglary trial of Joseph Cappo, Tallent was questioned about the participation of Occhipinti in one of the alleged crimes which occurred in Thibodaux on February 3, 1973. Tallent testified:
"Q. Did you ever see Mr. Occhipinti after the Lefort burglary?
"A. After the Lefort burglary? These dates are getting me all mixed up. That was on the 3rd of February. I was more or less thinking to myself. I can't say for certain.
"Q. You don't know if you ever saw him after that day. Is that correct?
"A. If I saw Mr. Cappo?
"Q. Mr. Occhipinti after the 3rd day of February, 1973, the time of the Lefort burglary.
"A. I am almost certain I did, but I would hesitate to say positively.
"Q. Did you or did you not testify here today that Joseph Cappo, Roy Occhipinti, and Dave DiVincenti planned all of the crimes that you committed in Lafourche Parish?
"A. That they planned them all?
"Q. Yes, or gave you information for you to plan them.
"A. In Lafourche Parish. I believe that's accurate for Lafourche Parish.
"Q. That Roy Occhipinti participated along with Cappo and DiVincenti in every crime that you committed in Lafourche Parish.
"A. Now, you are saying participated. I am saying that he had knowledge of these and that at one time or other actually was with me, drove me to these different residences, business places, showed them to me, described some of the circumstances along with Mr. Cappo. That's true.
"Q. Let's take the Sako robbery, which was in July, the end of July.
"A. The 22nd of July.
"Q. Did Mr. Occhipinti come and show you anything in connection with that crime?

*1211 "A. He showed me that some time earlier; much, much earlier than the crime itself, yes.
"Q. What would you call much earlier?
"A. Probably a month or two months maybe.
* * * * * *
"Q. Did you at any time after the Lefort burglary up to and including the time of the Sako robbery did you ever meet with Roy Occhipinti to plan any crimes in Lafourche Parish?
"A. Roy Occhipinti?
"Q. Yes.
"A. Of that I am not certain. I will have to say I cannot remember that. I am not certain about that."
After Tallent had testified, Occhipinti was called as a defense witness. During examination by Cappo's attorney, he testified:
"Q. How long did you operate that furniture store? Let me ask you this. Were you operating it in 1972 and 1973?
"A. Yes.
"Q. All of '73?
"A. No, sir. I operated it up until around I think some time like around the middle of February.
"Q. At that time what did you do?
"A. I moved to Pascagoula. I went there to run a motel.
"Q. What motel did you run there?
"A. The Dutch Inn for Mr. William Bosworth.
"Q. What hours did you work there?
"A. I was on twenty-four hour call, but I worked from 5:00 in the morning until 11:00 at night, and then when I would close at 11:00 at night the switchboard was connected to my apartment so any calls that came into the motel I had to be right there to answer them.
"Q. Between February, 1973 until when did you leave that job?
"A. I left there and moved back to New Orleans around January of '74.
"Q. Between February of '73 and January of '74 were you ever out of Pascagoula?
"A. Never. I was there twenty-four hours a day."
Defendant argues that this portion of his testimony was not material because it did not contradict any definite statement made by Tallent. Since Tallent's vacillating testimony did not amount to an assertion that defendant visited Lafourche Parish after February of 1973, defendant contends, it was completely consistent with his statement that he was never out of Pascagoula between February of 1973 and January of 1974.
We disagree. A reading of the Cappo trial testimony as a whole demonstrates that the essential effect of Tallent's testimony was to indicate that the defendant was deeply involved in all of the burglaries which occurred in Lafourche Parish during 1973 and that there was at least a strong possibility that Occhipinti had visited him in the Parish after February of that year. The thrust of Occhipinti's testimony was that there was absolutely no possibility that he could have been in Lafourche Parish during that time, that instead his job in Pascagoula demanded all of his time twenty-four hours per day all of which tended to show that the likelihood of his involvement in any of the crimes with Tallent was small. Therefore, Occhipinti's testimony had impeaching value and tended to show that Tallent had erred or falsified important facts in his testimony. Moreover, this attack upon Tallent's credibility was sharpened by the defense attorney who informed the jury in his opening statement that Occhipinti "could account for every minute of his time" during the period he was in Pascagoula. It is clear that the primary reason Occhipinti was called as a witness was to attack Tallent's credibility. An objective reading of the transcript supports the trial court's finding that the statement given by Occhipinti tended to undermine the testimony of Tallent. Accordingly, we find that the false statements were material, and that defendant's first assignment of error lacks merit.
*1212 ASSIGNMENT OF ERROR NO. 2
Defendant concedes that he gave the false testimony but contends that he did not understand the crucial questions put to him during the Cappo trial. Therefore, he argues that there was no evidence whatsoever to support the trial judge's finding that he had the requisite criminal intent required for perjury. We find, however, from reading defendant's Cappo trial testimony and his explanatory testimony in the instant case, sufficient evidence to support the trial court's determination that the State proved this element of the crime beyond a reasonable doubt.
For the foregoing reasons, defendant's conviction and sentence are affirmed.

On Rehearing
TATE, Justice.
The defendant was convicted of perjury, La.R.S. 14:123, and sentenced to two years at hard labor. The charge was based upon his testimony in a previous trial of another person.
The defendant had there testified, inter alia, that he worked and lived in Pascagoula, Mississippi, from February, 1973 to January, 1974, without leaving at any time. In actual fact, he did not move from New Orleans until the middle of April, 1973; and, while in Pascagoula, he visited New Orleans on frequent occasions.
The issue is whether this false statement under oath fell within the statutory requirement that, as an essential element of the crime, it "must relate to matter material to the issue or question in controversy." La.R.S. 14:123. As we held in our original opinion, our review is "directed toward an independent decision on the question of law of materiality." At 1210. "The plea of not guilty throws upon the state the burden of proving beyond a reasonable doubt each element of the crime necessary to constitute the defendant's guilt." La.R.S. 15:271 (1968).
The defendant Occhipinti's testimony at the prior trial was intended to impeach the credibility of Tallent, the state's star witness. Tallent and a confederate had actually committed the Lefort burglary of February 3, 1973, but the defendant in that case, a businessman, was charged with having helped Tallent plan the burglary, having waited outside while the burglary was committed, and with having shared in the proceeds.
Tallent also testified that the present defendant (Occhipinti) had similarly participated in that burglary, as well as had participated in planning several other Lafourche Parish crimes which were committed subsequent to the Lefort burglary.
Occhipinti, who had run a furniture store in New Orleans up through February, took the stand as a defense witness to deny ever having been in Lafourche Parish and ever having met Tallent. His obvious purpose in testifying was in support of the defense theory that Tallent had completely fabricated the alleged participation of businessmen in his crimes, for the purpose of making favorable plea bargains.
A brief part of the lengthy cross-examination of Tallent attempted to pin him down as to when he had last seen Occhipinti. As the attorney for the defendant in the previous trial testified, it would obviously discredit Tallent's testimony if, in fact, Occhipinti could be proved to have been in Pascagoula on any specific such date, by the records of the motel he was operating there.[1]
If in fact Occhipinti's false statement contradicted Tallent's testimony as to a date, then, as we held in our original majority opinion, the perjury related to a material issue, i. e., Tallent's credibility.
In our original opinion, we quoted Tallent's testimony at length as to the last date *1213 he claimed to have seen Occhipinti. We noted that Tallent first testified that he "would hesitate to say positively" that he had seen Occhipinti subsequent to the Lefort burglary of February 3. He then guessed he had seen Occhipinti "much, much earlier" than the Sako robbery of July 22, and, pressed for a more precise estimate, stated it was "probably a month or two months maybe." Finally, however, when pressed further as to whether he had seen Occhipinti after the February Lefort burglary, his final testimony was: "Of that I am not certain. I will have to say I cannot remember that. I am not certain about that."
Under this testimony, we now conclude that the only material issue as to Tallent's credibility concerning the date was whether in fact Occhipinti contradicted Tallent's credibility insofar as he testified that he had seen and been with Occhipinti on February 3 (the date of the Lefort burglary) and earlier. If, through inadvertence or otherwise, Occhipinti stated that he had moved from New Orleans in mid-February or March or October, it was immaterial to any issue of the case concerning Tallent's credibility. It made no difference as to the truth or not of Tallent's testimony.
At the previous trial, Occhipinti testified that he left Pascagoula for New Orleans "some time about the middle of February," where he was "on twenty-four hour call," until he left there and moved back to New Orleans "around January of '74." (In truth the move to Pascagoula did not occur until mid-April 1973.)
We are re-enforced in our belief that this misstatement was immaterial to any issue in the case by the circumstance that by far the larger importance of Occhipinti's testimony at the previous trial was that he had never seen Tallent before the Lefort burglary (and not until months later, after Tallent was arrested and had implicated him), that he had never been to Thibodaux, and that he definitely did not participate in the Lefort burglary or the other Lafourche Parish crimes in any manner[2]; as well as by the lack of any cross-examination on the date issue.[3] Further, "nothing is more common in court than an honest mistake as to dates, and if a charge of perjury is predicated on testimony relative to the date when a conversation occurred, the prosecution must establish beyond a reasonable doubt that the false statement was not given inadvertently." 3 Underhill's Criminal Evidence, Section 820, p. 1844 (5th ed., 1957).

Decree
Accordingly, we reverse the conviction and sentence, and we remand this case for further proceedings not inconsistent with the views expressed herein.
REVERSED AND REMANDED.
SUMMERS, J., dissents.
DENNIS, J., dissents for the reasons originally assigned.
NOTES
[1] The conviction and sentence imposed in that case were reversed by this Court in State v. Cappo, 345 So.2d 443 (La.1977).
[2] State v. Smith, 126 La. 135, 52 So. 244 (1910); see also, Anderson, Wharton's Criminal Law and Procedure, § 1312 (1957); Comment, "Perjury: The Forgotten Offense", 65 J.Crim.L. 361 (1975); McClintock, What Happens to Perjurers, 24 Minn.L.Rev. 727 (1940).
[3] Perkins on Criminal Law, p. 462 (2d ed. 1969); contra, People v. Clemente, 285 App. Div. 258, 136 N.Y.S.2d 202 (1st Dept.1954).
[4] La.Const. of 1974, Art. V, § 5(C); State v. Singleton, 252 La. 976, 215 So.2d 512 (1968).
[1] The counsel for the defendant in the previous case there argued in his opening statement, with regard to Tallent: "He tried to get Mr. Occhipinti into some of these cases [i. e., the other crimes], but he had to pull back because Mr. Occhipinti was running a motel in Pascagoula and he stayed there twenty-four hours a day and could account for every minute of his time."
[2] At the perjury trial, both Occhipinti and the defense counsel in the prior trial testified that, after Occhipinti left the stand, he realized that he misstated the April date as February (allegedly, through nervous inadvertence), but that defense counsel advised him it was not necessary to correct the misstatement because the variance was unimportant and immaterial.
[3] While the record is not clear, there are implications that the state knew at the time that, in fact, Occhipinti was still in New Orleans in late February and had afterwards visited there while in Pascagoula.

Cf. Bronston v. United States, 409 U.S. 352, 358-59, 93 S.Ct. 595, 600, 34 L.Ed.2d 568 (1973), where, in reversing a perjury conviction founded on an analogously misleading response to a question, the court stated, "If a witness evades, it is the lawyer's responsibility to recognize the evasion and bring the witness back to the mark, to flush out the whole truth with the tools of adversary examination"; there, the court also noted "`the obligation of protecting witnesses from oppression, or annoyance, by charges, of having borne false testimony, is far paramount to that of giving even perjury its desserts. To repress that crime, prevention [e. g., by cross-examination] is better than cure * * *."