William BELL, Appellant,

v.

The STATE of Texas, Appellee.

Nos. 01–99–00100–CR, 01–99–00101–CR.

Court of Appeals of Texas,
Houston (1st Dist.).

Aug. 3, 2000.

Rehearing Overruled Sept. 15, 2000.

---

Donald W. Rogers, Jr., Houston, for Appellant.

Rikke Burke Graber, John B. Holmes, Houston, for State.

Panel consists of Justices O'CONNOR, NUCHIA, and DUGGAN.*

## OPINION

MICHOL O'CONNOR, Justice.

William Bell, the appellant, was charged in two separate indictments with the offense of aggravated perjury. A jury found the appellant guilty as charged in both indictments. The jury assessed punishment at three years confinement in each cause with a recommendation of three years community supervision and a $10,000 fine in each cause, with the first $10,000 fine to be paid and the second fine to be probated. In six points of error, the appellant challenges the legal sufficiency of the evidence to support the verdicts. We reverse in part and affirm in part.

### Summary of Facts

In 1994, Holly Williamson, a partner at the law firm of Andrews & Kurth, met the appellant when the appellant was running for a district court bench in Harris County. Williamson decided to help the appellant with his campaign; she donated money, attended fund raisers, and introduced the appellant to members of her law firm. The appellant was elected to the bench of the 281st District Court.

Two years later, on January 20, 1996, Williamson and her husband attended the "Wild Game Dinner," a political function at the Briar Club in Houston. Late in the evening, the appellant asked Williamson if she would be interested in serving as an ad litem attorney on a case pending in his court. Williamson told the appellant she specialized in employment law and would not be interested unless the case was "big enough." The appellant told Williamson the case was, indeed, very large. The appellant described the case as involving numerous plaintiffs and prominent Houston attorneys. The appellant said he wanted the ad litem to be an attorney he could trust.

The appellant then made some disparaging comments about Bobby Meadows, an attorney for Chevron, a defendant in the case. The comments related to Meadows's credibility, and that the appellant did not trust him. Upon learning that Chevron was a party to the case, Williamson told the appellant her firm represented Chevron in other matters and she, therefore, could not become involved. To Williamson's surprise, the appellant intensified his criticism of Meadows. When Williamson and her husband got ready to leave, the appellant pointed his finger at them and said, "I want you to tell Chevron they have a problem." Williamson asked what the name of the case was and the appellant replied, "Kennedy Heights."

Uncomfortable with the information offered, Williamson decided to tell Chevron. On January 22, 1996, Williamson told Jack Lewis and Bobby Meadows, both attorneys for Chevron, of her conversation with the appellant and the message he wanted delivered. Meadows was very upset by the information. Meadows wanted to call the appellant and clear up the matter, but Williamson advised against it. Williamson told them she would get the appellant to clarify his statements. Williamson left a

*  The Honorable Lee Duggan, Jr., retired Justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

message at the appellant's courtroom asking him to return her call.

On January 24, 1996, the appellant called Williamson at her residence about eight o'clock in the morning. Williamson told him she had delivered the message as he requested, and Chevron was very concerned about it. In response, the appellant said something to the effect that he did not have a problem with Chevron, "They've had favorable verdicts in my courtroom." He told her that he believed Chevron and Meadows were being "outgunned" by the plaintiffs' attorneys. The appellant talked about discovery problems and that he did not want to grant Chevron another continuance. He told her the case was going to turn into an "environmental racism" case. He told her claims had been made that Chevron destroyed or refused to produce documents, which might result in a presumption against Chevron at trial. Williamson called Meadows that morning and reported the conversation.

On January 31, 1996, at about six o'clock in the evening, the appellant called Williamson at her office. By then, Judge David West, the Administrative Judge for Harris County, had been told about the appellant's conversations about the Kennedy Heights case. The first thing the appellant said to Williamson was he had heard she was going to provide an affidavit for a motion to recuse him from the Kennedy Heights case. He seemed angry. Williamson, who was unaware she was going to be asked for an affidavit, felt threatened by his tone.

On February 1, 1996, when Williamson arrived at work, she had two telephone messages from the appellant asking her to return his call and "get him off the bench." Before returning the call, Williamson decided to tape-record the conversation without telling the appellant. When the appellant got on the line, he asked her to recount what she had told Judge West. Williamson said she told West and Chevron everything he said about the Kennedy Heights case. During the conversation, he repeatedly said he was Chevron's friend, and he wanted someone with "cojones" to tell him what to do. The taped conversation lasted just over 13 minutes. After the conversation, Williamson told her husband and one law partner that she had taped the phone call.

**The Recorded Conversation**

The relevant parts of the conversation recorded by Williamson on February 1, 1996, is:

Appellant: Okay. Well, I, I didn't want your people at Chevron to think I, y'know, some of this I remember, some of it I don't. Uh, but what, what matters most is what you think you heard versus what I think I said.

Williamson: Mm hmm.

Appellant: Uh, obviously, I'm, I want Chevron to get a fair trial and I don't think they've got an enemy in me, but they may think they do. Um, I guess they do.

Williamson: I don't know because I have not been dealing with it from that end. I mean they have not, Chevron has not come to me and asked me for my advice on this or anything. The only thing I have done is reported to Chevron.

Appellant: Oh, if anything, they . . .

Williamson: It's . . .

Appellant: They really do have a friend in me or I wouldn't have said anything at all.

Williamson: Okay.

Appellant: Would have let them just take it, uh, it, you when I discrepancies on the record I, I got to tell you, I got a problem with that, but I don't, like I said, I don't know if that was his doin' or not. Uh, it very well could have been Gulf's doin', and they didn't tell anybody.

Williamson: And, and you said that when we spoke . . .

Appellant: And, and . . .

Williamson: I mean . . .

Appellant: And, and, I, my concern is I think they do have a friend in me, I just, they obviously think that they do—don't, and I don't know if that's because of Mr. Meadows or otherwise. Um, if somebody over there says, "Jeez, we're so scared of you that we just don't think we can do this." I'd like somebody to hav-, to have big enough cojones to tell me straight up that.

. . .

Appellant: Yeah. Well, I mean if they've got a real problem, and they think that I won't give 'em a fair trial, I'd like to know that they really feel that way. I am just afraid they're out-gunned.

Williamson: Yeah.

Appellant: And that's the only message I was really wantin' to, to get conveyed to them because I really am a friend. Uh, and I'm sorry they don't feel that way but I am.

. . .

Appellant: Okay. Well, I'd like to know from somebody what they want me to do.

Williamson: Uh . . .

Appellant: Somebody with cojones big enough to tell me what they want me to do. 'Cause right now, it, I mean, if he wants to file a, a motion I guess he can, but I, I feel like I'm bending over backwards to try and help Chevron. I really do. And, 'cause I want 'em to get a fair case. I want them to get a fair trial, that's all I've ever wanted, and I don't want anybody to think otherwise. But if they feel so strongly about it, tell me. Have guts enough to tell me. I guess, is what I'm saying.

**Williamson's Affidavit**

On February 13, 1996, Judge West called Williamson and asked her to pre-pare an affidavit about the appellant's conversations regarding the Kennedy Heights case. Williamson prepared the affidavit without reviewing the tape and gave it to Judge West. Williamson did not speak with the appellant until a Christmas party later that year. In the affidavit, Williamson said the appellant told her he needed Chevron to know he was "its friend," and he wanted someone from Chevron with "cojones" to tell him "what to do in this case."

**The Hearing Before the Commission**

In May 1997, Williamson received a subpoena to appear before the State Commission on Judicial Conduct for a hearing on May 20. Judge Brock Jones presided over the proceedings against the appellant. At the hearing, Williamson testified about her conversations with the appellant. Williamson said he told her he wanted "someone with cojones" to tell him what to do, and Chevron needed to know he was its friend.

**The Appellant's Testimony Before the Commission**

On May 27, 1997, The appellant appeared before the State Commission on Judicial Conduct, presided over by Judge Brock Jones. His sworn testimony relevent to the issues before us is:

Question: Let's talk about cojones. No. 8. This is-the prosecution says that on February 1st you had a conversation with Ms. Williamson that you wanted someone from Chevron with cojones.

Appellant: That's not what I said.

Question: Do you understand the implications of this comment?

Appellant: I understand it, but it was directed-but it wasn't directed at Chevron. It was directed at Ms. Williamson.

Question: You'll have to explain it.

Appellant: I told her I wanted her to have the balls to go back to Chevron and tell them she had made a mistake. I use the word cojones with the ladies, but I also use the word balls.

Question: You meant it figuratively, I assume?

Appellant: Yes.

. . .

Question: February 1st, '96, Ms. Williamson said that you told her that you wanted someone from Chevron with cojones to tell you what to do in this case and that Chevron needed to know you were its friend.

Appellant: I did not tell her those things.

Question: Did you tell her you were Chevron's friend?

Appellant: I think I said, if anything, I was everyone's friend . . .

### The Transfer of the Tapes to the District Attorney

After the appellant's testimony to the Commission, a lawyer who works with Meadows told Williamson the appellant denied making the statements. Williamson listened to the tape. Late that same evening, Williamson told the director of the commission that she had a tape of the conversation. The following morning, Williamson and her attorney delivered the tape to Harris County District Attorney John Holmes.

### Legal Standards of Review

■ To establish aggravated perjury, the State must prove the appellant (1) with intent to deceive (2) with knowledge of the statement's meaning, (3) made a false statement under oath, (4) that was required or authorized by law to be made under oath, (5) in connection with an official proceeding, and (6) the false statement was material. Tex. Penal Code §§ 37.02–.03; *McCullar v. State*, 696 S.W.2d 579, 581 (Tex.Crim.App.1985); *Bonilla v. State*, 933 S.W.2d 538, 540 (Tex.App.—Houston [1st Dist.] 1995, no pet.). The appellant

claims there was no evidence of element three, that he "made a false statement under oath."

■ We review legal sufficiency by viewing the evidence in the light most favorable to the verdict to determine if any rational fact finder could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979); *Santellan v. State*, 939 S.W.2d 155, 160 (Tex.Crim.App. 1997). If there is evidence that establishes guilt beyond a reasonable doubt and if the fact finder believes the evidence, we will not reverse the judgment for insufficient evidence. *Moreno v. State*, 755 S.W.2d 866, 867 (Tex.Crim.App.1988); *Reece v. State*, 878 S.W.2d 320, 325 (Tex.App.—Houston [1st Dist.] 1994, no pet.). The jury is entitled to judge the credibility of the witnesses and may choose to believe all, some, or none of the witness's testimony. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex.Crim.App.1986); *Reece*, 878 S.W.2d at 325. It is the jury's job to reconcile conflicts in the evidence. *Heiselbetz v. State*, 906 S.W.2d 500, 504 (Tex.Crim.App.1995).

### Literal Truth of Statements

In points of error one and two, the appellant claims the evidence in both causes is legally insufficient to support his convictions for aggravated perjury because the State did not prove the falsity of the appellant's denials to the commission.[1] The appellant argues that a literally true statement cannot support a conviction because a false statement is an essential element of the offense of aggravated perjury. He contends the evidence is legally insufficient to support the convictions because his testimony to the commission, upon which the indictments were based, was literally true based on the contents of the taped conversation. Therefore, he ar-

---

1. Point of error one, appellate cause number 01–99–00100–CR, and trial cause number 789788, refer to the "friend" statement.

Point of error two, appellate cause number 01–99–00101–CR, and trial cause number 789789, refer to the "cojones" statement.

gues the statements are not false as required for a perjury conviction.

The appellant relies on *Bronston v. U.S.*, 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973), to support his "literal truth" argument. In *Bronston,* the appellant claims the Supreme Court held that, regardless of the defendant's intent to deceive or mislead, there can be no perjury if the witness spoke the literal truth. *Id.* at 358–59, 93 S.Ct. 595, 600. In *Bronston,* the defendant gave answers that were deliberately misleading but literally true. The Court noted it was "undisputed that [defendant's] answers were literally truthful." *Id.* at 355, 93 S.Ct. 595, 598.

■ Here, the State responded that the appellant's reliance on the "literal truth" doctrine is misplaced because the doctrine is inapplicable in Texas, where the perjury statute requires proof of intent to deceive. Additionally, the State contends it was unnecessary for the State to prove the exact language that was alleged in the indictments. The State claims the jury was entitled to infer from the evidence presented that the substance of the appellant's statements to Williamson were the same as those alleged in the indictments.

**"Friend" Statement**

■ The appellant argues he did not say on the recorded telephone conversation "that Chevron needed to know that he was its friend," as stated in the indictment.

The indictment charged the appellant as follows:

The duly organized Grand Jury of Harris County, Texas, presents in the District Court of Harris County, Texas, that in Harris County, Texas, William Bell, hereafter styled the Defendant, heretofore on or about May 22, 1997, did then and there unlawfully, personally appear at the official proceeding, namely, a formal hearing conducted by Special Master Brock Jones by Order of the Supreme Court of Texas, concerning Judge # 68, said matter pending before the State Commission on Judicial Conduct, and in connection with and during that proceeding and after being duly sworn, the defendant did, under oath, make a false statement, namely, that he had not told Holly Williamson, in a conversation concerning the Kennedy Heights Case, that Chevron needed to know he was its friend, whereas in truth and in fact he had told Holly Williamson, in a conversation concerning the Kennedy Heights Case, *that Chevron needed to know he was its friend,* and the defendant did make the statement with knowledge of the statement's meaning and with intent to deceive, and the statement was material and could have affected the outcome of the official proceeding, and the statement was authorized by law to be made under oath.

(Emphasis added.)

In the recorded conversation with Williamson, the appellant said:

Uh, obviously, I'm, I want Chevron to get a fair trial and I don't think they've got an *enemy* in me, but they may think they do. Um, I guess they do.

. . .

They really do have a *friend* in me or I wouldn't have said anything at all.

. . .

And, and, I, my concern is I think they do have a *friend* in me, I just, they obviously think that they do—don't and I don't know if that's because of Mr. Meadows or otherwise.

. . .

Well, I mean if they've got a real problem and they think that I won't give 'em a fair trial, I'd like to know that they really feel that way. I am just afraid they are outgunned.

. . .

And that's the only message I was really wantin' to, to get conveyed to them because I really am a *friend.* Uh, and I'm sorry they don't feel that way but I am.

At the hearing before the commission, the appellant testified:

> Question: February 1st, '96, Ms. Williamson said that you told her that you wanted someone from Chevron with cojones to tell you what to do in this case and *that Chevron needed to know you were its friend.*
>
> Appellant: I did not tell her those things.
>
> . . .
>
> Question: *Did you tell her you were Chevron's friend?*
>
> Appellant: I think I said, if anything, I was *everyone's friend* . . .

The State admits the appellant never expressly said to Williamson, "Chevron needs to know that I am its friend." The State argues we can conclude the appellant committed perjury by adding together three statements: (1) the appellant told Williamson he was Chevron's friend; (2) Williamson told the appellant that she would report the conversation to Chevron; and (3) the appellant said "okay" after Williamson said she would report the conversation to Chevron. The State contends the appellant assented to Williamson's statement that she was going to tell Chevron everything he told her, including the fact he was Chevron's friend. We disagree with the State's reasoning for a number of reasons.

First, the State cites no authority for the proposition that perjury can be committed by piecing together a statement by the defendant with the statements of others. Second, even if the appellant assented to Williamson's report to Chevron, assenting to the report to Chevron is a far cry from telling her that "Chevron needed to know." Third, the only charge that could be supported by the "friend" statement is if the appellant had been indicted for denying that he said he was Chevron's friend, not that Chevron needed to know he was its friend. Fourth, in stating "I am just afraid they're outgunned . . . And that's the only message I was really wan-

tin' to, to get conveyed to them because I really am a friend," the appellant told Williamson he wanted Chevron to know they were getting outgunned, not that he was a friend.

We sustain point of error one.

## Cojones Statement

██ The appellant asserts he never told Williamson, as charged, "he wanted someone from Chevron with cojones to tell him what to do in this case."

The indictment charged the appellant as follows:

> The duly organized Grand Jury of Harris County, Texas, presents in the District Court of Harris County, Texas, that in Harris County, Texas, William Bell, hereafter styled the Defendant, heretofore on or about May 22, 1997, did then and there unlawfully, personally appear at the official proceeding, namely, a formal hearing conducted by Special Master Brock Jones by Order of the Supreme Court of Texas, concerning Judge # 68, said matter pending before the State Commission on Judicial Conduct, and in connection with and during that proceeding and after being duly sworn, the defendant did, under oath, make a false statement, namely, that he had not told Holly Williamson, in a conversation concerning the Kennedy Heights Case, *that he wanted someone from Chevron with cojones to tell him what to do in this case*, whereas in truth and in fact he had told Holly Williamson, in a conversation concerning the Kennedy Heights Case, that he wanted someone from Chevron with cojones to tell him what to do in this case, and the defendant did make the statement with knowledge of the statement's meaning and with intent to deceive, and the statement was material and could have affected the outcome of the official proceeding, and the statement was authorized by law to be made under oath.

(Emphasis added.)

In the recorded telephone conversation with Williamson, the appellant said:

And, and, I, my concern is I think they do have a friend in me, I just, they obviously think that they do—don't and I don't know if that's because of Mr. Meadows or otherwise. Um, if somebody over there says "Jeez, we're so scared of you that we just don't think we can do this." *I'd like somebody to hav-, to have big enough cojones to tell me straight up that.*

. . .

Yeah. Well, I mean if they've got a real problem and they think that I won't give them a fair trial, I'd like to know that they feel that way.

. . .

Okay. Well, I'd like to know from somebody what they want me to do. *Somebody with cojones big enough to tell me what they want me to do.* 'Cause right now, it, I mean, if he wants to file a, a motion I guess he can, but I, I feel like I'm bending over backwards to try and help Chevron. I really do.

At the hearing before the commission, the appellant testified:

Question: Let's talk about cojones. No. 8. This is-the prosecution says that on February 1st you had a conversation with Ms. Williamson *that you wanted someone from Chevron with cojones.*

Appellant: That's not what I said.

Question: Do you understand the implications of this comment?

Appellant: I understand it, but it was directed-but it wasn't directed at Chevron. It was directed at Ms. Williamson.

Question: You'll have to explain it.

Appellant: I told her I wanted her to have the balls to go back to Chevron and tell them she had made a mistake. I use the word cojones with the ladies, but I also use the word balls.

Question: You meant it figuratively, I assume?

Appellant: Yes.

. . .

Question: February 1st, '96, Ms. Williamson said that you told her that *you wanted someone from Chevron with cojones to tell you what to do in this case* and that Chevron needed to know you were its friend.

Appellant: I did not tell her those things.

The appellant claims that, because he did not specify Chevron, as alleged in the indictment, he could have been referring to Meadows, Williamson, Judge West, or the plaintiffs' attorneys.

In the cojones statement, the appellant established that he was referring to Chevron when he said, "over there." The appellant said:

I don't know if that's because of Mr. Meadows or otherwise. Um, if somebody *over there* says 'Jeez, we're so scared of you that we just don't think we can do this.' I'd like somebody to hav-, to have big enough cojones to tell me straight up that ... somebody with cojones big enough to tell me what they want me to do. 'Cause right now, it, I mean, if he wants to file a, a motion I guess he can, but I, I feel like I'm bending over backwards to try and help Chevron.' I really do.

Early in the recorded conversation, the appellant referred to Chevron by name, but later referred to Chevron as "they." This is exemplified in his comment early in the conversation when he said "I want Chevron to get a fair trial and I don't think they've got an enemy in me...." The appellant established "they" as Chevron. We find it is reasonable for the jury to conclude beyond a reasonable doubt that "they" referred to Chevron. *See, e.g., Ly v. State*, 931 S.W.2d 22, 23 (Tex.App.—Houston [1st Dist.] 1996, no pet.) (difference between "an attorney licensed in Texas" and "a member of the State Bar of Texas" was not a fatal variance); *Hall v. State*, 843 S.W.2d 190, 191–92 (Tex.App.—Houston [14th Dist.] 1992, no pet.) (minor

semantic differences between charge and evidence are not fatal).

Viewing all of the evidence presented in the light most favorable to the verdict, we find the evidence was sufficient to support the jury's conclusion that the appellant perjured himself when he denied making the "cojones" statement.

We overrule point of error two.

### Williamson's Testimony Not Enough to Support Conviction

■ In points of error three and four, the appellant claims the evidence is legally insufficient because the State did not prove the falsity of his statements by testimony of more than one witness. The appellant argues that the State offered only Williamson's testimony to prove the falsity of his testimony.

The State contends the appellant ignores the admission into evidence of the tape recorded conversation between Williamson and the appellant. The State asserts the tape sufficiently corroborated Williamson's testimony.

Article 38.18(a) of the Texas Code of Criminal Procedure provides:

No person may be convicted of perjury or aggravated perjury if proof that his statement is false rests solely upon the testimony of one witness other than the defendant.

The appellant bases these points of error on the fact that the recorded conversation does not, in his view, corroborate the testimony of Williamson. He contends the tape contradicts Williamson on the "cojones" statement.[2] As a result, he argues the State violated article 38.18(a) of the Code of Criminal Procedure.

He, once again, argues his testimony was literally true and the tape supports this contention. We do not agree. The tape clearly supports the State's indict-ments on the "cojones" statement. Minor differences between the wording on the tapes and the indictment does not advance his argument under these points of error. We overrule points of error three and four.

### "Unlawful" Appearance

■ In points of error five and six, the appellant attacks the legal sufficiency of the evidence because the State did not present the required proof that his appearance before Judge Jones was "unlawful." He claims the language in the indictments that he "on or about May 22, 1997, did then and there unlawfully, personally, appear at an official proceeding" before Judge Jones bound the State to prove his appearance was unlawful. The appellant contends this language cannot be rejected as surplusage because this describes the means and manner in which the alleged offense was committed. The appellant submits that the State offered no evidence to show his appearance was unlawful.

The State claims that aggravated perjury does not require proof that the appellant "unlawfully appeared" at an official proceeding. The State argues that both indictments contained all the requisite elements of aggravated perjury. As a result, the "unlawfully appear" language is surplusage and constitutes an unnecessary allegation not related to the offense. Additionally, the State argues that "unlawful" has meaning only when applied to the charges of "aggravated perjury" and does not have meaning when applied to the appellant's appearance at official proceeding. The State claims that "unlawfully" modified the entire allegation, not the appearance.

■ The general rule is that allegations that are not essential to constitute the offense, and which might be entirely omitted without affecting the charge against the defendant, and without detri-

---

2. We limit the appellant's argument to the "cojones" statement because we sustained the error relating to his "friends" statement.

ment to the indictment, are treated as surplusage. *Eastep v. State*, 941 S.W.2d 130, 134 (Tex.Crim.App.1997). Surplusage is unnecessary language not legally essential to validity of the indictment. *Id.* If, however, the additional language describes an essential element of the offense charged, then the State must prove that language in addition to the statutory elements of the offense, beyond a reasonable doubt. *Wray v. State*, 711 S.W.2d 631, 633 (Tex.Crim.App.1986).

In *Malazzo v. State*, 165 Tex.Crim. 441, 308 S.W.2d 29, 31 (1957), the Court of Criminal Appeals held:

> Where the value of property alleged to have been stolen does not determine whether the offense is a felony or a misdemeanor, nor control the punishment applicable to the theft, the allegation as to its value is not descriptive of the offense and need not be proven.

In this case, the State had to prove beyond a reasonable doubt that: the appellant (1) with intent to deceive (2) with knowledge of the statement's meaning, (3) made a false statement under oath, (4) that was required or authorized by law to be made under oath, (5) in connection with an official proceeding, and (6) that the false statement was material. Tex. Penal Code §§ 37.02 & .03.

Similar to the *Malazzo* reasoning, the presence of "unlawfully" in reference to the appellant's appearance at the official proceeding, did not affect whether the charge was a misdemeanor or felony nor did it control the punishment in any way. As a result, the presence of "unlawfully" in the indictment does not affect the description of the offense when read against the elements of aggravated perjury.

Because its presence in the indictment is surplusage, the State was not required to prove the appellant's appearance was unlawful. We overrule points of error five and six.

We sustain point of error one, reverse the judgment in cause number 789788, and remand to the trial court with instructions that a judgment of acquittal be entered in cause number 789788. We overrule the remaining points of error and affirm the trial court's judgment in cause number 789789.