In re **GRAND JURY PROCEEDINGS.**

No. 99–38 (NHJ).

United States District Court, District of Columbia.

Oct. 6, 2000.

See also 192 F.3d 995.

John D. Griffith, U.S. Department of Justice, Fraud Section, Criminal Division, Washington, DC, Alan Gershel, U.S. Department of Justice, Washington, DC, for U.S.

Robert Mark Weinberg, Bredhoff & Kaiser, P.L.L.C., Washington, DC, Michele A. Roberts, Washington, DC, for Charles G. Bakaly, III.

David Evan Kendall, Williams & Connolly, Washington, DC, for William Clinton.

Warren Neil Eggleston, Howrey, Simon, Arnold & White, Washington, DC, for Office of President of U.S.

Lisa Simotas, Department of Justice, Civil Rights Division, Criminal Section, Washington, DC, for U.S. Dept. of Justice.

## MEMORANDUM OPINION

NORMA HOLLOWAY JOHNSON, Chief Judge.

On July 13 through July 18, 2000, the Court, sitting without a jury, presided over the trial of criminal contempt charges lodged against Charles G. Bakaly, III. These charges stem from the filing of an allegedly false sworn declaration in connection with the February 1, 1999, motion of President William Jefferson Clinton and the White House for an order to show cause why the Office of the Independent Counsel ("OIC") should not be held in contempt for violating Federal Rule of Criminal Procedure 6(e). Based on evidence in the record, the Court finds that the following facts have been proved beyond a reasonable doubt. When the relevant law is applied to those facts, the Court concludes that the Government has not proved its charges beyond a reasonable doubt and, therefore, the Court finds that Mr. Bakaly is not guilty of criminal contempt.

## I. BACKGROUND [1]

1. On February 1, 1999, President Clinton and the White House (collectively "movants") filed a motion for an order to show cause why the OIC, or individuals therein, should not be held in contempt for violations of Rule 6(e). In their motion, movants alleged that a member or members of the OIC violated Rule 6(e) by disclosing grand jury materials which were published in a January 31, 1999, article in the *New York Times,* written by Don Van Natta Jr., entitled "Starr is Weighing Whether to Indict Sitting President." Movants claimed that the *Times* article revealed secret grand jury materials regarding "a critical aspect of the strategy of the investigation of the President, the potential timing of an indictment, and the specific allegations that are likely to be contained in an indictment." Memoran-

---

**1.** This background discussion is limited to undisputed facts contained in the record.

dum in Support of Motion for Order to Show Cause at 3.

2. Specifically, movants cited the following excerpts from the January 31, 1999, *Times* article:

- "The independent counsel, Kenneth W. Starr, has concluded that he has the constitutional authority to seek a grand jury indictment of President Clinton before he leaves the White House in January 2001, several associates of Mr. Starr said this week."

- "While the President's legal team has fought in the Senate chamber for the President's political survival, Mr. Starr and his prosecutors have actively considered whether to ask a Federal grand jury here to indict Mr. Clinton before his term expires, said Mr. Starr's associates, who spoke on condition of anonymity."

- "Inside the Independent Counsel's Office, a group of prosecutors believes that not long after the Senate trial concludes, Mr. Starr should ask the grand jury of 23 men and women hearing the case against Mr. Clinton to indict him on charges of perjury and obstruction of justice, the associates said. The group wants to charge Mr. Clinton with lying under oath in his Jones deposition in January 1998 and in his grand jury testimony in August, the associates added."

- "Since early last year, the constitutional question has been exhaustively researched by two constitutional law experts who are paid consultants to Mr. Starr: Ronald D. Rotunda of the University of Illinois Law School and William Kelley of the University of Notre Dame. Both Mr. Rotunda and Mr. Kelley have concluded that the 1997 Supreme Court decision in the Paula Jones case suggests that the Constitution does not prohibit a prosecutor from seeking an indictment, trial and conviction of a sitting President, the associates said."

3. According to movants, "[t]hese are all matters that fall squarely within the protective bounds of Rule 6(e) and should have never been disclosed publicly." *Id.* at 3. Based on these excerpts, movants claimed that a prima facie showing of a Rule 6(e) violation had been made because the *Times* article "(1) disclose[d] 'matters occurring before the grand jury' and (2) suggest[ed] that the sources of the information include government attorneys or their agents." *Id.* at 2 (citing *Barry v. United States*, 865 F.2d 1317, 1325 (D.C.Cir.1989)).

4. On the same day that the motion of the President and the White House for an order to show cause was filed, Donald Bucklin, an attorney representing the OIC, sent a hand-delivered, *ex parte* letter to the Court. In his letter, Mr. Bucklin informed the Court of "deep concern" within the OIC regarding the *Times* article which "purports to report highly sensitive and confidential internal OIC information." Letter of February 1, 1999, from Donald Bucklin to the Honorable Norma Holloway Johnson at 1. While this letter did not address the Rule 6(e) allegations raised by the President and the White House, Mr. Bucklin apprised the Court that "[t]he disclosures in the article were unauthorized and a violation of OIC press policy." *Id.*

5. This letter further informed the Court that a thorough internal investigation was being undertaken in order "to determine whether anyone in the OIC was in any way the source of the *New York Times* article." *Id.* Toward that end, the assistance of the Federal Bureau of Investigation ("FBI") was being solicited. *Id.* Mr. Bucklin further stated that while the author of the *Times* article had advised the OIC that "his attribution to Independent Counsel Starr's 'associates' referred to individuals *outside the OIC*," the OIC was nonetheless determined to conduct a thorough internal investigation and had already directed any member of the OIC "with information on the article's source to bring it to Independent Counsel Starr's

attention immediately." *Id.* at 1–2 (emphasis in original).

6. On February 9, 1999, the OIC filed its opposition to the motion for an order to show cause in which it made two separate arguments: (1) that the *Times* article did not disclose 'matters occurring before the grand jury' and (2) even if it did, the article does not attribute its disclosures to the OIC. Opposition to the Motion for Order to Show Cause at 2–3 (citing *Barry v. United States,* 865 F.2d 1317, 1321 (D.C.Cir.1989)). By rebutting each prong of the *Barry* test, the OIC's arguments were intended to demonstrate that no prima facie violation of Rule 6(e) had taken place. The OIC asserted that "[i]f Movants fail to establish either prong, their motion must fail." Opposition at 3.

7. As its primary argument, the OIC asserted that the first prong of the *Barry* test was not met. The OIC claimed that the confidential and sensitive disclosures made in the article did not contain grand jury material because *"the article does not disclose any action taken or contemplated by the grand jury* . . . . Rather, the article merely discusses options available to the OIC and the purported views of a nebulous group of OIC prosecutors." *Id.* at 2 (emphasis in original). Mr. Bakaly's allegedly false statements did not relate to this first prong of the *Barry* test.

8. In addressing the second prong of the *Barry* test, the OIC argued that "because the article does not attribute its disclosure to the OIC, Movants cannot establish a *prima facie* case." *Id.* 'In support of its second argument, the OIC told the Court that "the term 'associates' [of Independent Counsel Starr] does not necessarily suggest that the sources [of the *Times* article] were *within the OIC.* That attribution, as well as the nature of the information disclosed, must be read in connection with the author's representation to OIC spokesman Charles G. Bakaly, III, that his sources were in fact *outside the OIC." Id.* (citing Declaration of Charles G. Bakaly, III, attached to the OIC's Opposi-

tion at Tab A) (emphasis in original). The OIC's argument on the second prong of the *Barry* test and the sworn declaration of Mr. Bakaly in support of that argument are central to these contempt proceedings.

9. Mr. Bakaly submitted a sworn declaration to support the OIC's response to the motion to show cause. In order to prepare the declaration for submission to the Court, Mr. Bakaly spoke with Donald Bucklin or his associate, Andrew Cohen, on several occasions between February 3 and February 9, 1999. During that period, Mr. Bakaly reviewed and made changes to at least three drafts of the declaration. On February 9, 1999, the Bakaly declaration was signed, sworn under the penalty of perjury pursuant to the provisions of 28 U.S.C. § 1746, and filed with the Court in support of the OIC's opposition to the motion for an order to show cause.

10. In this declaration, Mr. Bakaly tells the Court that he has served as Counselor to Independent Counsel Starr since April 13, 1998, and his responsibilities in that capacity include "addressing strategic and public policy issues, and communication of the work of the Office of the Independent Counsel ("OIC") to the general public." Bakaly Declaration at ¶ 1. He states that he also served as "the OIC's spokesman and contact person with the news media." *Id.*

11. The declaration of Mr. Bakaly then informs the Court that "[d]uring the past several weeks, I have had at least four conversations with Don Van Natta Jr. of the *New York Times* concerning an article he was preparing on various issues that would remain after the conclusion of the Senate impeachment trial." *Id.* at ¶ 3. Mr. Bakaly states that he first spoke with Mr. Van Natta as early as January 11, 1999, at which time:

Mr. Van Natta explained that he wanted to . . . report on various alternatives available to the OIC and to attempt to juxtapose the ongoing Senate proceedings with the OIC's work. I did not

provide Mr. Van Natta with any information about OIC intentions, but noted only that several other reporters had already written on the subject or were working on similar stories. *Id.* at ¶¶ 4–5.

12. Mr. Bakaly states in his declaration that he next recalls speaking with Mr. Van Natta on or about January 21, 1999. During this conversation, Mr. Bakaly tells the Court that he and Mr. Van Natta discussed a recent *New York Times* article written by Mr. Van Natta's colleague, Jill Abramson. *Id.* at ¶ 6. Ms. Abramson's article concerned a possible trial of the President and others following the Senate impeachment proceeding. *Id.* With regard to Ms. Abramson's article, Mr. Bakaly declares that "[c]onsistent with the position I took with Mr. Van Natta, I declined to discuss non-public matters with Ms. Abramson, and her article states: 'Charles G. Bakaly 3d, a spokesman for the Independent Counsel's Office, would not comment on any indictment speculation . . . .' " *Id.*

13. Mr. Bakaly continues by stating:

[Mr. Van Natta] told me that he had learned that Judge Starr had recently been convinced that he could indict the President while in office, and that a group within the OIC believed the President should be indicted. Mr. Van Natta told me that he had learned this information from *sources outside the OIC* . . . . I refused to confirm or comment on what Judge Starr or the OIC was thinking or doing. I agreed to provide an on-the-record quote, which appeared in Mr. Van Natta's article: "We will not discuss the plans of this office or the plans of the grand jury in any way, shape or form."

*Id.* at ¶¶ 7–8 (emphasis in original).

14. Finally, Mr. Bakaly refers to one further conversation with Mr. Van Natta, on either January 28 or January 30, 1999. During the course of this conversation, Mr. Bakaly states that:

it became apparent that [Mr. Van Natta] was going to proceed with the article. I expressed my concerns over how he intended to source the information that he described to me as coming from outside the OIC. I feared that information about the purported views of Judge Starr and some group within the OIC would be perceived as originating from within in [sic] the Office. Mr. Van Natta again assured me that his sources were *outside the OIC,* that he was "working on his sourcing," and that he intended to make it clear in his article that his sources were not within the OIC.

*Id.* at ¶ 11 (emphasis in original).

15. Throughout the month of February 1999, the OIC's internal investigation of the source of the *Times* article proceeded with the assistance of the FBI. Between February 1 and February 26, 1999, Mr. Bakaly met with various OIC attorneys, outside counsel for the OIC, and FBI agents on several occasions to discuss his conversations with Mr. Van Natta. On February 26, 1999, Mr. Bucklin was informed by FBI officials that Mr. Bakaly had made certain statements and admissions that appeared inconsistent with the Bakaly declaration and oral statements previously made to Mr. Bucklin.

16. Informed of the FBI's concern that certain statements in the Bakaly declaration may be false, Mr. Bucklin and OIC attorney Jackie Bennett met with the Court in chambers and stated that certain arguments in the OIC's opposition brief and statements in the Bakaly declaration would possibly need to be withdrawn. "Mr. Bucklin therefore asked the Court not to rule on [the pending Motion for an Order to Show Cause filed by President Clinton and the White House] until hearing further from the OIC." Stipulation at 1 (Government Ex. 19). On March 1, 1999, Mr. Bucklin and Mr. Bennett informed the Court that the investigation to determine whether certain statements in the Bakaly declaration were false was proceeding. Mr. Bucklin told the Court that another

submission from the OIC would be forthcoming, however, some additional time was still needed. *Id.*

17. On March 8, 1999, the OIC filed a pleading captioned "Amendment to the Opposition of the OIC to the Motion for Order to Show Cause and Withdrawal of Argument and Supporting Declaration." In its amendment, the OIC notes that it had presented two arguments in its opposition: 1) that the *New York Times* article did not disclose matters occurring before the grand jury in violation of Rule 6(e)(2) and 2) that the OIC was not the source of the disclosures complained of by movants. Amendment to the Opposition of the OIC at 1. The OIC previously relied upon the Bakaly declaration and representations purportedly made to Mr. Bakaly by Mr. Van Natta to support its second argument. *Id.* In withdrawing its reliance on the Bakaly declaration, the OIC states that:

> [r]ecently, the FBI informed undersigned counsel that Mr. Bakaly had acknowledged to its investigators that he provided Mr. Van Natta some of the information reported in the *New York Times* article or confirmed the accuracy of information that Mr. Van Natta already possessed and attributed to sources outside the OIC. The investigation is continuing and the OIC has referred the matter to the Department of Justice.... Accordingly, the OIC withdraws and abandons that portion of its opposition that argues it is not the source of the disclosures in the *New York Times* article, along with the supporting declaration.

*Id.* at 1–2. Nonetheless, the OIC continued to maintain that the *Times* article did not disclose any matters occurring before the grand jury and, therefore, no *prima facie* violation of Rule 6(e) should be found. *Id.* at 2.

18. On March 25, 1999, the Court entered an Order to Show Cause, finding that one passage of the *Times* article disclosed matters occurring before the grand jury in violation of Rule 6(e). Specifically,

the Court held that the following paragraph contained grand jury material:

> "Inside the Independent Counsel's Office, a group of prosecutors believes that not long after the Senate trial concludes, Mr. Starr should ask the grand jury of 23 men and women hearing the case against Mr. Clinton to indict him on charges of perjury and obstruction of justice, the associates said. The group wants to charge Mr. Clinton with lying under oath in his Jones deposition in January 1998 and in his grand jury testimony in August, the associates added."

Order to Show Cause at 5–6 (quoting the *Times* article). It was the Court's belief that this passage could be considered a disclosure " 'discussing the scope, focus and direction of the grand jury investigation.' " *Id.* at 6 (quoting *Fund for Constitutional Gov't v. National Archives & Records Serv.*, 656 F.2d 856, 869 (D.C.Cir. 1981)). Therefore, because the OIC had now abandoned its argument that it was not the source of the disclosure, the Court found that, under the *Barry* test, an order to show cause must issue to the OIC and Mr. Bakaly directing them to demonstrate that they had not violated Rule 6(e).

19. In addition to the *prima facie* violation of Rule 6(e), the Court also ordered Mr. Bakaly to show cause why he should not be held in contempt for filing a false or materially misleading affidavit with the Court. *Id.* at 3. In directing Mr. Bakaly to address this allegation, the Court noted that:

> Mr. Bakaly swore to this Court, under penalty of perjury, that he did not provide Mr. Van Natta with any information regarding the OIC's confidential deliberations or the OIC's intentions with respect to indicting the President. [Bakaly Declaration] at ¶¶ 5–6, 8 & 9. Furthermore, Mr. Bakaly stated that Mr. Van Natta had told him that all the information for the story regarding the indictment of the President came from

sources outside the OIC. *Id.* at ¶¶ 7 & 11.

Order to Show Cause at 2.

20. The Court found that it was presented with formal allegations from the FBI that Mr. Bakaly had provided Mr. Van Natta " 'some of the information reported in the *New York Times* article or confirmed the accuracy of information that Mr. Van Natta already possessed and attributed to sources outside the OIC.' " *Id.* at 3 (quoting the Amendment to the Opposition of the OIC at 1–2). In expressing its grave concern over the allegation that Mr. Bakaly had filed a false declaration, the Court stated that:

> [a]s an attorney and an officer of the Court, Mr. Bakaly has a duty of candor which requires that he not make false representations to the Court. He also bears an obligation of fairness to opposing parties and counsel that includes a duty not to falsify testimony in an effort to mislead or obstruct justice. Furthermore, as a federal prosecutor, he bears an even greater obligation to see that justice is done.

*Id.*

21. The Court charged "Mr. Bakaly to appear at a hearing to address the serious allegation that he filed a materially false declaration intended to mislead this Court and to show cause why he should not be held in contempt for his conduct." *Id.* The hearing was set for April 28, 1999, and the OIC and the FBI were ordered to produce all relevant investigative reports *in camera.* The Court stated that the contempt proceeding against Mr. Bakaly would be civil in nature, but reserved "the right to refer this matter to the appropriate prosecutorial authorities if a criminal contempt proceeding is warranted." *Id.* at 3 n. 2.

22. On April 26, 1999, upon application of the Department of Justice ("DOJ"), the Court stayed the civil contempt proceeding against Mr. Bakaly and the OIC for sixty days pending the resolution of DOJ's parallel criminal investigation into the same or closely related conduct. The Court made clear that the stay would be only of short duration and, in order to monitor the stay, the Court required that DOJ file *in camera* status reports informing the Court of the progress of its criminal investigation. Upon further application of DOJ, the Court extended its stay to July 15, 1999, and required DOJ to file an additional status report.

23. By letter dated July 13, 1999, DOJ informed the Court that it would not seek an extension of the stay of contempt proceeding in this matter. DOJ further informed the Court of its view that "after reviewing evidence gathered in the course of its criminal investigation, that the alleged misconduct committed by Mr. Bakaly can best be addressed and remedied through the contempt proceedings already initiated by the Court and, upon conclusion of that action, by referral to the District of Columbia Bar." Letter of July 13, 1999, from Michael Horowitz, Deputy Assistant Attorney General, to the Honorable Norma Holloway Johnson at 1. DOJ further suggested that "in light of the nature of the allegations against Mr. Bakaly and the sanctions that would likely be imposed upon him if he were found guilty by the Court, that Mr. Bakaly should be provided with the procedural protections of the criminal law ... and the contempt proceedings therefore should be considered criminal rather than civil in nature." *Id.* In addition, DOJ advised the Court that a jury trial was not required because, should Mr. Bakaly be found guilty, DOJ would not recommend a term of imprisonment in excess of six months. *Id.* (citing *Cheff v. Schnackenberg*, 384 U.S. 373, 378, 86 S.Ct. 1523, 16 L.Ed.2d 629 (1966)). Finally, DOJ stated its willingness to accept an appointment to prosecute criminal contempt charges against Mr. Bakaly, if the Court chose to pursue that course of action. *Id.* at 2.

24. Accompanying DOJ's July 13, 1999, letter was an *in camera* submission, contained in a sealed envelope. This submis-

sion was described as a report of the Government's criminal investigation, including a detailed description of the evidence gathered during the investigation. To date, that envelope remains sealed and its contents have not been reviewed by the Court.

25. The Court adopted DOJ's recommendations for proceeding with criminal contempt charges against Mr. Bakaly in an Order entered on July 14, 1999, and appointed DOJ to prosecute the charges. While DOJ's recommendation only pertained to the charges against Mr. Bakaly for allegedly filing a false declaration, the Court noted that it still needed to resolve its findings of a *prima facie* violation of Rule 6(e) by Mr. Bakaly and/or other members of the OIC. Order of July 14, 1999, at 2 n.2. In order to resolve these related matters through a single contempt proceeding, the Court directed DOJ to proceed with criminal contempt charges against both Mr. Bakaly and the OIC and lifted its stay of the matter. *Id.* at 2.

26. The OIC appealed and sought summary reversal of the Court's order subjecting it to criminal contempt charges for violating Rule 6(e).

27. On September 7, 1999, the Court of Appeals reversed this Court's finding of a *prima facie* violation of Rule 6(e). *See In re Sealed Case*, 192 F.3d 995 (D.C.Cir. 1999). Specifically, the Court of Appeals held that the disclosures regarding the scope, focus, and direction of the grand jury investigation did not constitute matters occurring before the grand jury. *Id.* at 1001. In addressing this Court's finding of a *prima facie* violation, the Court of Appeals noted that:

[i]t may be thought that when such [internal deliberations of prosecutors] include a discussion of whether an indictment should be sought, or whether a particular individual is potentially criminally liable, the deliberations have crossed into the realm of Rule 6(e) material. This ignores, however, the requirement that the matter occur before the grand jury. When reported deliberations do not reveal that an indictment has been sought or will be sought, ordinarily they will not reveal anything definite enough to come within the scope of Rule 6(e).... The general uncertainty as to whether an indictment would be sought (according to the article, only some prosecutors in OIC thought one should be) leads us to conclude that this portion of the article did not reveal anything that was "occurring before the grand jury."

*Id.* at 1003–04. Thus, because the Court of Appeals found that the passage in question only revealed the internal deliberations of the OIC and not any information that actually had been put before the grand jury, the disclosure did not violate Rule 6(e) and the contempt proceeding against the OIC was dismissed.

28. On November 29, 1999, DOJ filed its Notice of Essential Facts Constituting Criminal Contempt or Rule 42(b) Notice. The DOJ filed an Amended Rule 42(b) Notice on June 23, 2000.

29. The Amended Rule 42(b) Notice contains introductory allegations setting forth the background of this proceeding and a statutory charge, pursuant to 18 U.S.C. § 401(1), which states:

STATUTORY CHARGE—
18 U.S.C. § 401(1)

On or about February 9, 1999, in the District of Columbia, Bakaly did knowingly make, and cause to be made, to this Court materially false or misleading statements and representations, and did knowingly omit and conceal material facts from the Court, to wit:

12. At the time he signed the Bakaly Declaration, Bakaly knew that it would be submitted to this Court in connection with the OIC's Opposition Brief and knew that the Declaration contained the following materially false and misleading statements and representations (underlined for the purpose of this notice):

12(a). "I next recall a conversation with Mr. Van Natta on this subject on or about January 21, 1999. This occurred just a few days after an article by Jill Abramson appeared in the *New York Times*. Ms. Abramson's article addressed possible trials of the President and others after the conclusion of the Senate impeachment proceeding. A copy of Ms. Abramson's article is attached hereto at Tab 2. **Consistent with the position I took with Mr. Van Natta, I declined to discuss non-public matters with Ms. Abramson,** and her article stated: 'Charles G. Bakaly, 3d, a spokesman for the Independent Counsel's Office, would not comment on any indictment speculation . . .'" (Bakaly Declaration, ¶ 6, page 2).

At the time that Mr. Bakaly made the above underlined statement and representation he knew it was false and misleading in that he did, in fact, discuss non-public matters with Mr. Van Natta, such as:

1) Confirming four options regarding the possible indictment of President Clinton;

2) That a perjury count based on the deposition given in the Jones lawsuit was a stronger case than the perjury count being tried in the Senate;

3) That Professor Rotunda is not in the office very much and that Mr. Udolf left the office in April or May, 1998, and may be biased against the OIC; and

4) That Judge Starr relies quite a bit on Professor Kelley's advice.

12(b). "I cautioned Mr. Van Natta that he should not rely on information from outside sources purporting to know what was going on inside the OIC. I noted that people often overstate their knowledge as well as their own importance. In an effort to steer Mr. Van Natta away from an inaccurate report, I suggested that Judge Starr was himself a constitutional scholar and would not be swayed by any one person or recent event. *I refused to confirm or comment on what Judge Starr or the OIC was thinking or doing.* I agreed to provide an on-the-record quote, which appeared in Mr. Van Natta's article: 'We will not discuss the plans of this office or the plans of the grand jury in any way, shape or form.'" (Bakaly Declaration, ¶ 8, page 3)

At the time that Mr. Bakaly made the above underlined statement and representation he knew it was false and misleading in that he did, in fact, discuss with Mr. Van Natta what Judge Starr or the OIC was thinking or doing, such as:

1) Confirming four options regarding the possible indictment of President Clinton;

2) Discussing internal OIC matters with Mr. Van Natta in an attempt to influence Mr. Van Natta to write the article in a way which would "protect the Office"; and

3) That a perjury count based on the deposition given in the Jones lawsuit was a stronger case than the perjury count being tried in the Senate.

12(c). "During a conversation with Mr. Van Natta on either January 28 or 30, 1999, it became apparent that he was going to proceed with the article. I expressed my concerns over how he intended to source the information that he described to

me as coming from outside the OIC. I feared that information about the purported views of Judge Starr and some group within the OIC would be perceived as originating from within in [sic] the Office. *Mr. Van Natta again assured me that his sources were outside the OIC, that he was 'working on his sourcing' and that he intended to make it clear in his article that his sources were not within the OIC.* I also expressed concern over the timing of his article during the Senate impeachment trial-and that the OIC would once again be unfairly criticized for interfering in the Senate's business. Mr. Van Natta said that he had not thought of that as an issue." (Bakaly Declaration ¶ 11, pages 3–4)

At the time that Mr. Bakaly made the above underlined statement and representation he knew it was false and misleading in that he was, in fact, the source of some information attributed to an associate or associates of Judge Starr and would not have been told by Mr. Van Natta that Mr. Van Natta's sources were outside the OIC.

13. Based on Bakaly's knowing failure to disclose material information to Bucklin, Cohen, and OIC personnel regarding his disclosures to Van Natta, including information described in paragraphs 12(a)(1) through (4), 12(b)(1) through (3) and 12(c), as well as the materially false and misleading statements and representations underlined in paragraph 12(a), (b) and (c) above, Bakaly knowingly caused the following materially false and misleading statements and representations to appear in the Opposition Brief:

"Mr. Bakaly declined to provide Mr. Van Natta with any information about OIC intentions, noting only that several other reporters had already written on the subject or were working on similar stories." (Opposition Brief, page 12)

"In a subsequent conversation prior to the article's publication, Mr. Van Natta advised Mr. Bakaly that he had learned that Mr. Starr recently had been convinced that a sitting President could be indicted. Mr. Van Natta also told Mr. Bakaly that he was aware that a group of OIC prosecutors felt that the President should be indicted. *Mr. Van Natta further told Mr. Bakaly that all his information came from sources 'outside' the OIC.*

Mr. Bakaly refused to confirm the information that Mr. Van Natta already possessed." (Opposition Brief, page 13)

14. As a result of Bakaly's false and misleading statements and representations and material omissions described in paragraphs 12(a) through (c) and 13 above, proceedings in this Court, including consideration of the February 1 Motion for Order to Show Cause, were delayed and unnecessary work and costs were incurred by the Court and the parties as further described in paragraphs 8 through 10 above.

The above-stated conduct by Charles G. Bakaly, III, constituted misbehavior in the presence of the Court or so near thereto as to obstruct the administration of justice in violation of Title 18 U.S.C. § 401(1).

Amended Rule 42(b) Notice at ¶¶ 12–14 (emphasis in original).

30. The foregoing allegations comprise the complete criminal contempt charges that Mr. Bakaly faced at trial. The Court now turns to the specific facts that were proved beyond a reasonable doubt.

## II. *FINDINGS OF FACT*

31. Acting in his capacity as Counselor and media spokesperson for the OIC, Charles Bakaly met *New York Times* reporter Donald Van Natta for breakfast at the Willard Hotel on January 11, 1999.

Trial Transcript ("Tr.") at 213. At that breakfast meeting, Mr. Van Natta informed Mr. Bakaly that he was working on an article about the plans of the OIC after the conclusion of the impeachment trial in the Senate. Tr. at 213–14, 298. Specifically, Mr. Van Natta was interested in writing an article on the possibility that the OIC might indict the President and on any discussions within the OIC pertaining to indictment options. Tr. at 214.

32. At the time of Mr. Bakaly's first meeting with Mr. Van Natta, the reporter conceded to Mr. Bakaly that he had little more than speculation similar to what had already published in the past on this topic, most recently in a January 10, 1999, *Washington Post* article by Marianne Lavelle, entitled "Indictments Unlimited; Why Starr Won't Stop." Tr. at 46 at 298. Still, Mr. Van Natta insisted to Mr. Bakaly that he intended to write an article about .......... topic that would go beyond what Ms. Lavelle had already written by looking inside the OIC. Tr. at 46. Coming away from this meeting with Mr. Van Natta, Mr. Bakaly decided that he would "take a risk" by continuing to speak to Mr. Van Natta on these confidential and sensitive topics in the hope of guiding Mr. Van Natta to write an article that would be positive for the OIC—informing the public that the OIC would still be in operation following the impeachment trial and may seek an indictment of the President. Tr. at 267, 297–99. In Mr. Bakaly's words, he wished to "aggressively .... 'set the stage' for [the OIC's] future work including the possible criminal prosecution of the President regardless of the outcome of the Senate impeachment trial." Government Exhibit ("Gov.Ex.") 14 at 1(internal quotation in original);[2] *see also* Tr. at 468.

33. Mr. Bakaly next met with Mr. Van Natta for another breakfast meeting at the Willard Hotel on January 21, 1999. Tr. at 214. At this meeting, Mr. Van Natta told

Mr. Bakaly that he had three new pieces of information: 1) that Independent Counsel Starr had recently reached the conclusion that the President could be indicted while still in office; 2) that certain members of the OIC were arguing that the President should be indicted after the impeachment trial concluded; and 3) that attorneys from the OIC had been at the National Archives researching the deliberations of the Special Prosecutors during the Watergate investigation of President Richard Nixon. Tr. at 214–15. Mr. Van Natta told Mr. Bakaly that this information came from sources outside of the OIC. Tr. at 47, 214, 385. Mr. Van Natta further informed Mr. Bakaly that he could likely guess the sources of this information. Tr. at 40, 216, 301. Mr. Bakaly speculated that Mr. Van Natta was alluding to Ronald Rotunda, a consultant to the OIC, or Bruce Udolf, a former member of the OIC, because Mr. Bakaly believed that Mr. Van Natta was talking to Mr. Rotunda and Mr. Udolf. Tr. at 217, 220, 301. Mr. Bakaly cautioned Mr. Van Natta that these sources are removed from the OIC itself and, therefore, the reporter should first present any information that he had to Mr. Bakaly in order to ensure its accuracy. Tr. at 105, 301.

34. During the course of several subsequent interviews with the FBI, Mr. Bakaly discussed the January 21, 1999, meeting with Mr. Van Natta. Mr. Bakaly admitted to the FBI agents that he told Mr. Van Natta that these three pieces of information could have only come from sources within the OIC. Tr. at 215, 224–25, 246, 269–70, 284, 299. However, the testimony of the FBI agents at trial regarding the meaning of Mr. Bakaly's statement was somewhat ambiguous. It is unclear whether Mr. Bakaly's statement that this was "pretty good information" that only could have come from within the OIC pertained to all three pieces of information or

---

2. Government Exhibit 14 is a "Signed Sworn Statement" that Mr. Bakaly gave to the FBI on February 26, 1999. At trial, he stated that

everything in that statement is true and he continues to "stand by the statement." Tr. at 440, 461.

solely to the least sensitive and the least confidential piece of information—that OIC attorneys were undertaking historical research at the National Archives. Tr. at 269–70 (testimony of Agent Lewis limiting Mr. Bakaly's confirming comments to OIC research being conducted at the National Archives); *see also* Tr. at 284 (Agent Lewis testified during cross-examination that "Mr. Bakaly told me that in telling Mr. Van Natta that the third [piece of information], that research was being conducted at the National Archives, had to have come from someone inside the Office of Independent Counsel, he was inadvertently confirming what Mr. Van Natta had told him."); *but see* Tr. at 215, 224–25, 246, 299 (testimony of Agents Erbach and Robinson suggesting that Mr. Bakaly's confirming statement pertained to all three pieces of information). In light of this ambiguity, the Court cannot find beyond a reasonable doubt that Mr. Bakaly specifically confirmed two far more sensitive pieces of information—that the Independent Counsel has concluded that he has the authority to indict the President and that a group of prosecutors are urging an indictment—by directly stating that this information was "good" and only could have come from within the OIC.

35. Mr. Bakaly has acknowledged that his ongoing discussions with Mr. Van Natta on the non-public and sensitive topics of Independent Counsel Starr's opinion regarding the potential indictability of a sitting President and the fact that a group of OIC prosecutors were pushing for an indictment shortly after the Senate impeachment trial may have "inadvertently confirmed" to the reporter that his information regarding the OIC's internal deliberations was accurate. Tr. at 300. Specifically, in his sworn statement to the FBI, Mr. Bakaly acknowledged that:

> During conversations I had with Mr. Van Natta between January 11 and January 30, 1999, we discussed the option of Mr. Starr seeking an indictment of Mr. Clinton. During the conversations I had with Mr. Van Natta on January 21, 1999, and January 28, he indicated to me that he had information from outside the Office of Independent Counsel that there was a group of lawyers in the Independent Counsel's office who thought the President should be indicted after the conclusion of the Senate impeachment trial. I tried to talk him away from this issue and may have inadvertently confirmed these facts by not explicitly denying them. I felt it was inappropriate for me to confirm, deny, or comment on that information. I repeated my concerns about how this information I knew he would report was going to be sourced.

Gov. Ex. 14 at 5. Despite his sworn statement regarding inadvertent confirmation, Mr. Bakaly continues to claim that he never confirmed or commented to Mr. Van Natta on what Independent Counsel Starr or the OIC were thinking or doing. Tr. at 384–85, 387–88. Rather, Mr. Bakaly claimed that his "inadvertent" confirmation comment was merely speculation as to how Mr. Van Natta may have interpreted his comments. Tr. at 247. While the Court finds that Mr. Bakaly did not expressly confirm this sensitive, non-public information, the Court must conclude that Mr. Bakaly's ongoing discussions with Mr. Van Natta did lead the reporter to believe that his information was accurate and was consistent with internal OIC sources.

36. Beyond this "inadvertent" confirmation, Mr. Bakaly made an effort to assist Mr. Van Natta with his article and to steer him toward the historical debate regarding the indictment of a sitting President. Tr. at 219, 388. Toward this end, Mr. Bakaly had his secretary fax a redacted internal OIC memorandum to the reporter. Tr. at 213, 389. This memorandum was authored by OIC attorney Stephen Bates and detailed statements made by the Watergate special prosecutors concerning their authority to indict a sitting President. The redacted copy of the so-called "Bates Memorandum" that Mr. Bakaly sent to Mr. Van Natta did not

contain any marks that would identify this document as an internal OIC memorandum. *See* Gov. Ex. 7 (redacted Bates Memorandum). Rather, the redacted document clearly identified and cited historical arguments and quotations from the Watergate era. In its redacted form, the document is accurately identified in the Bakaly declaration as "a compilation and summary of excerpts from the Watergate Special Prosecution Force Report and from books written by Leon Jaworski (The Right and the Power) and James Doyle (Not Above the Law)." Gov. Ex. at ¶ 9; *see also* Gov. Ex. 7.

37. On January 27, 1999, the OIC held an "all-attorneys" meeting in order to discuss options relating to the possible indictment of the President and what actions the OIC should take regarding potential indictment following the impeachment trial. Tr. at 169, 211. All OIC attorneys were urged to attend this meeting and most of them did. Tr. at 194–96, 211. Mr. Bakaly attended part of the meeting, but left before its conclusion. Tr. at 211. The meeting began with an especially strong admonition that its substance was to remain strictly confidential. Tr. at 170–01, 463. The OIC attorneys then discussed the sensitive matters of the options and timing of any indictment of the President, what charges would be the strongest based on the evidence, and any other issues that OIC attorneys raised relating to the indictment of the President. Tr. at 169, 171, 212.

38. On January 28, 1999, Mr. Bakaly again met with Mr. Van Natta at the Willard Hotel and, at this meeting, he became convinced that Mr. Van Natta's article would be published shortly. Tr. at 216, 313. In addition to the three pieces of information that Mr. Van Natta had mentioned in their earlier meeting, the reporter now stated that he knew that the OIC was considering four options with regard to the indictment of the President: 1) indict the President and wait to try him until he leaves office; 2) indict the President

under seal and seek to postpone trial until he leaves office; 3) indict the President after he leaves office; or 4) not indict the President. Tr. at 217–18. Mr. Bakaly was very troubled that Mr. Van Natta was discussing these four options at this January 28th meeting because the exact same options had just been discussed the day before at the OIC's all-attorney meeting regarding the possible indictment of the President. Tr. at 171, 308, 393, 462. In fact, these four options had been outlined on a "flip chart" at the January 27 all-attorneys meeting and a "straw vote" on these options had been taken. Tr. at 172, 242–44, 463.

39. Mr. Bakaly confirmed to Mr. Van Natta that "these were the prosecutive options available to the independent counsel" and discussed these options with Mr. Van Natta. Gov. Ex. 14 at 4; *see also* Tr. at 282–83, 394, 462. By acknowledging these four options to the reporter at this sensitive juncture, the Court finds that Mr. Bakaly did confirm for him that these were the indictment options that the OIC was considering. Nonetheless, the Court finds no evidence in the record from which to conclude that Mr. Bakaly disclosed to Mr. Van Natta any details of internal OIC discussions of these options or indicated which option the OIC favored. Tr. at 256–57, 394. Moreover, Mr. Van Natta did not specifically tell Mr. Bakaly that he was aware of the all-attorneys meeting and Mr. Bakaly did not mention the meeting to Mr. Van Natta. Tr. at 394, 463.

40. At this point, Mr. Bakaly knew that Mr. Van Natta did indeed have sensitive information and he suspected that the reporter had raised these options as a direct result of the OIC's confidential meeting discussing such matters the day before. Tr. at 400–01. As a result, Mr. Bakaly was very concerned about how the article would be sourced. Tr. at 49–50, 268, 313, 400–01, 409–10. Mr. Bakaly believed that Mr. Van Natta's potential article, if not sourced to shield the involvement of Mr. Bakaly or other members of the OIC,

would be his "worst nightmare." Tr. at 225. Accordingly, during a number of telephone conversations, he urged Mr. Van Natta that sensitive information in the article be attributed to sources outside the OIC and he told Mr. Van Natta that "I don't want to get burnt," meaning that he did not want to be recognizable as a source of information in the article. Gov. Ex. 14 at 4; Tr. at 268–69, 313. Mr. Van Natta responded that he was still working on sourcing the article. Tr. at 50, 269. At Mr. Bakaly's urging, Mr. Van Natta included in his article the statement that "Charles G. Bakaly, 3d, the spokesman for Mr. Starr, said, 'We will not discuss the plans of this office or the plans of the grand jury in any way, shape or form.'" Gov. Ex. 1 at 1; *see also* Tr. at 272, 307–08. Mr. Bakaly felt that this disclaimer was necessary to deflect anticipated suspicion that he was a source for the article. Tr. at 272, 307–08.

41. On January 30, 1999, Mr. Van Natta had a final version of the article faxed to Mr. Bakaly's home. Tr. at 227–28, 271. Upon reviewing the article, Mr. Bakaly realized that he was recognizable as the source for portions of the article. Tr. at 271, 314. In a colorful admission made to the FBI, Mr. Bakaly stated that his immediate reaction was "'[o]h, sh-! I'm the associate of Ken Starr [referenced in the article].'" Tr. at 314. "'I played a risky game and I got burnt at this. And I feel bad, because when I look at this article, every time I see the term "associate," . . . I believe that he is referring to me.'" Tr. at 271 (Agent Lewis quoting Mr. Bakaly). Mr. Bakaly had contemplated resigning over the article at that point, but later reconsidered. Tr. at 315.

42. When Mr. Bakaly returned to the office on Monday, February 1, 1999, the day after the article was published on the front page of the *Times,* many members of the OIC were very concerned about confidential disclosures contained in the article. Tr. at 173–74, 315, 473–74. Two OIC attorneys circulated a memorandum stating

their outrage because it appeared as though Mr. Van Natta had been privy to their discussions at their all-attorneys meeting on January 27th, despite strident admonitions that the meeting was to remain strictly confidential. Tr. at 315. As Mr. Bakaly stated at trial, "the problem that the Office had, and understandably that my colleagues had, [was] that they felt that Van Natta, somehow the reporter had been inside the conference room [during that January 27th all-attorneys meeting where the four options regarding the indictment of the President were discussed.]" Tr. at 473.

43. On February 1, 1999, Mr. Bakaly had the first of a series of meetings and telephone conversations with Donald Bucklin and Andrew Cohen, the outside attorneys who represent the OIC in connection with charges of violating grand jury secrecy. Tr. at 31, 392. Mr. Bakaly told Mr. Bucklin that, during the course of several conversations with Mr. Van Natta prior to the publication of the article, Mr. Bakaly had learned that Mr. Van Natta had much of the confidential and sensitive information that appeared in the article. Tr. at 392. Specifically, Mr. Bakaly told Mr. Bucklin that the reporter was aware that certain members of the OIC favored indicting the President and that the OIC was considering four options regarding indictment. Tr. at 38, 98–100, 392–93. Mr. Bakaly assured Mr. Bucklin that Mr. Van Natta had told Mr. Bakaly that all of the sources for this sensitive information came from outside the OIC. Tr. at 38, 100. Moreover, Mr. Bakaly expressly vowed to Mr. Bucklin that he was not "an associate of Ken Starr" as that term was used in the article. Tr. at 39, 66, 124, 129–30.

44. At the time of Mr. Bakaly's first meeting with OIC's outside counsel, movants had not yet filed their motion for an order to show cause. Tr. at 93. Thus, Mr. Bakaly's discussion with Mr. Bucklin on February 1, 1999, was more in the nature of a preliminary and internal investigation. Tr. at 93. The motion for an order to

show cause was filed later that day. Shortly thereafter, the OIC launched a more formal internal investigation of the leaks that led to Mr. Van Natta's article. Tr. at 177. This investigation was conducted by the FBI. Tr. at 35, 177. Solomon Wisenberg, an OIC attorney, acted as the office liaison to the FBI for the purpose of this internal leaks investigation. Tr. at 35, 177.

45. On either February 2 or 3, 1999, Mr. Wisenberg spoke to Mr. Bakaly to determine the extent of his contacts with Mr. Van Natta prior to the publication of the article. Tr. at 179. At that point, Mr. Wisenberg had been informed that Mr. Bakaly had provided the reporter with a redacted version of the Bates Memorandum and Independent Counsel Starr's testimony before the House Judiciary Committee regarding the potential indictability of a sitting President. Tr. at 175. Mr. Wisenberg asked Mr. Bakaly if he had provided Mr. Van Natta with any other information contained in the article and Mr. Bakaly stated that he had not. Tr. at 179–80. The Court finds that this statement did not accurately reflect the amount and sort of information that Mr. Bakaly had actually provided to Mr. Van Natta. Furthermore, Mr. Bakaly told Mr. Wisenberg that he had spoken to Mr. Van Natta after the article had been published and the reporter had told Mr. Bakaly that the term "associate" in the article did not refer to anyone inside the OIC, even though he was aware that he in fact was an "associate" cited in the article. Tr. at 190–91.

46. On February 3, 1999, Independent Counsel Starr called Mr. Bucklin and informed him that Mr. Bakaly had come forward and acknowledged that he had sent a redacted internal OIC memorandum, the Bates Memorandum, to Mr. Van Natta. Tr. at 42–43. In light of this new revelation and for the purpose of crafting the OIC's response to the motion for an order to show cause, Mr. Bucklin interviewed Mr. Bakaly again. Tr. at 43, 52. At that point, Mr. Bakaly informed Mr.

Bucklin that certain quotes from the Bates Memorandum had found their way into the *Times* article. Tr. at 113–14, 122. After reviewing the redacted Bates Memorandum, Mr. Bucklin was relieved to discover that the memorandum did not concern any actions that might be taken by the OIC—it was purely historical. Tr. at 44. Because Mr. Bucklin determined that the redacted Bates Memorandum did not concern any action being contemplated or taken by the OIC, he did not see a need to examine Mr. Bakaly's suggestion that portions of the Bates Memorandum are quoted in Mr. Van Natta's article. Tr. at 123, 128.

47. Mr. Bucklin proceeded to interview Mr. Bakaly again with a view toward drafting the declaration that Mr. Bakaly ultimately signed and filed with the Court in support of the OIC's opposition to the motion to show cause. Tr. at 52. Again, Mr. Bakaly affirmed that Mr. Van Natta had sources outside the OIC that told him that the OIC was considering the indictment of the President and that Mr. Bakaly had not confirmed that information. Tr. at 46–47, 100. Mr. Bakaly also told Mr. Bucklin that Mr. Van Natta had promised to make it clear in the article that his sources for this confidential information had come from outside the OIC. Tr. at 50.

48. Following this meeting, OIC outside counsel began the process of drafting a declaration to submit with the OIC's opposition to the motion to show cause. Tr. at 52. The information in the declaration was based on Mr. Bakaly's interviews with OIC outside counsel. Tr. at 52. According to Mr. Bucklin, "[t]he purpose of Mr. Bakaly's declaration ... was to advise the Court that the author of the article represented to us that his sources were outside of the Office of Independent Counsel, notwithstanding the use of the term 'associates' and notwithstanding the [confidential nature] of the information itself." Tr. at 53.

49. Once Mr. Bucklin and Mr. Cohen completed an initial draft of the declaration, they forwarded it to Mr. Bakaly for

his edits and revisions. Tr. at 53, 261–62. At trial, Mr. Bakaly argued that his edits to the declaration demonstrate that he was attempting to limit its broad scope, thereby shedding some light on whether he had the requisite intent to deceive or mislead the Court with the final version of his declaration. Tr. at 262. The Court will now proceed to make findings regarding certain revisions to the declaration that were suggested by Mr. Bakaly.

50. The Court finds that the only relevant revisions are contained in the draft of the declaration identified as "DRAFT 02/08/99 1:47 PM." Gov. Ex. 3c. Paragraph 5 of this draft relates to the January 11, 1999, conversation between Mr. Bakaly and Mr. Van Natta and states "I refused to provide Mr. Van Natta with any information other than to note the fact that several other reporters had already written on the subject [of various alternatives available to the OIC regarding the potential indictment of the President] or were working on similar stories." *Id.* Mr. Bakaly suggested that this sentence be revised to read "I did not provide Mr. Van Natta with any information about [OIC] intentions other than to note . . ." *Id.* (revisions in bold). Mr. Bakaly's revisions were adopted in the final version of the declaration. *Id.*

51. Paragraph 6 of this draft pertains to the January 21, 1999, conversation between Mr. Bakaly and Mr. Van Natta regarding Mr. Bakaly's involvement in a recent article by Jill Abramson, one of Mr. Van Natta's colleagues at the *New York Times.* In its original form, the relevant sentence stated, "[c]onsistent with the position I took with Mr. Van Natta, I had refused to provide any information for Ms. Abramson." Gov. Ex. 3c at ¶ 6. Mr. Bakaly rewrote the sentence to read, "[c]onsistent with the position I took with Mr. Van Natta, I declined to discuss non-public matters with Ms. Abramson." *Id.* (revisions in bold). This revision was also included in the final version of the declaration. *Id.*

52. Finally, paragraph 9 of this draft relates to the documents that Mr. Bakaly acknowledged providing to Mr. Van Natta, namely, the redacted Bates Memorandum and the Independent Counsel's testimony before the House Judiciary Committee. The draft originally stated that "[t]his was the only information that I provided to Mr. Van Natta, none of which in any way related to grand jury matters." Gov. Ex. 3c at ¶ 9. Mr. Bakaly suggested that this sentence be shortened to state only that "[n]one of this information in any way related to grand jury matters." *Id.* Again, his revision of this sentence was included in the final version of the declaration. *Id.*

53. In addition to drafting the Bakaly declaration, OIC outside counsel also prepared a brief in opposition to the motion for an order to show cause. Tr. at 69. The OIC opposition brief was filed with the Court along with the Bakaly declaration on February 9, 1999. Tr. at 71. One of the counts of criminal contempt lodged against Mr. Bakaly states that his failure to disclose material information to OIC outside counsel and his use of false or misleading statements in his declaration caused false or misleading representations to be made to the Court in the OIC's opposition brief. *See* Amended Rule 42(b) Notice at ¶ 13. Specifically, the relevant statements in the opposition brief represented that: 1) Mr. Bakaly had declined to provide Mr. Van Natta with any information regarding the OIC's intentions; 2) Mr. Van Natta had told Mr. Bakaly that certain sensitive information came from sources "outside" the OIC; and 3) Mr. Bakaly had refused to confirm information that Mr. Van Natta already possessed. *Id.*

54. While Mr. Bakaly did not review the OIC opposition brief prior to filing, he had been informed by Mr. Bucklin of the arguments that would be made in the brief based on his declaration. Tr. at 69–71. Mr. Bucklin testified that he made it clear to Mr. Bakaly that the OIC was "going to rely on Mr. Bakaly's affidavit for the argu-

ment that [the OIC was] not the source of the information in the Van Natta article that was alleged to have been 6(e)." Tr. at 71. In fact, the OIC's argument that it was not the source of the sensitive disclosures that movants complained about in their motion to show cause was based almost exclusively on information provided by Mr. Bakaly in his interviews with OIC outside counsel and contained in his declaration. Tr. at 72. As Mr. Bucklin noted, "the only thing we discuss [in the opposition brief's second argument] is Mr. Bakaly and Mr. Van Natta's conversations." Tr. at 72.

55. Following the filing of the OIC's opposition brief and the Bakaly declaration with the Court, the OIC continued conducting its internal investigation of the source of the *Times* article. During the course of several interviews with FBI agents, Mr. Bakaly acknowledged that he was indeed the source, or a source, for much of the information found in the article. Accordingly, the Court must compare the article with evidence in the record in order to reach findings of fact regarding the overall role that Mr. Bakaly played as a source for Mr. Van Natta's article.

56. On February 25, 1999, Mr. Bakaly was interviewed by FBI Agent Thomas Lewis and Mr. Bakaly acknowledged that he was the source for two particular quotes in the *Times* article. Tr. at 272. The first quote, attributed to "Mr. Starr's associates," states "that neither the outcome of the Senate trial nor the public's wishes expressed in opinion polls would affect [Independent Counsel Starr's] decision. 'Prosecutors do not take polls to decide what to do,' another associate of Mr. Starr said. 'Ken has proven he is immune to polls.'" Gov. Ex. 10 at 1 (copy of *Times* article containing handwritten check marks of Agent Lewis, identifying statements that Mr. Bakaly admitted providing to Mr. Van Natta); Tr. at 274. Mr. Bakaly told Agent Lewis that those quotes came from him and that he felt betrayed by Mr. Van Natta's sourcing of these

quotes because knowledgeable people reading the article would know that these statements came from him. Tr. at 274. As Mr. Bakaly told Agent Lewis, "this is a dead giveaway" that he is the associate of Mr. Starr cited in this paragraph. *Id.* In his sworn statement given to the FBI on February 26, 1999, Mr. Bakaly again admits that these statements are "a direct quote made by me during one of the conversations I had with Mr. Van Natta." Gov. Ex. 14 at 4.

57. The second quote found in the *Times* article that Mr. Bakaly took responsibility for in his February 25 interview with Agent Lewis is expressly attributed to him. This paragraph states that:

At a November breakfast meeting with reporters here, Mr. Bakaly, the Independent Counsel's spokesman, said that Mr. Starr had not ruled out the option of seeking an indictment of Mr. Clinton after his term ended, but Mr. Bakaly quickly added: "I don't want to send any signals here. There's no statute of limitations problem. We have developed a criminal case."

Gov. Ex. 10 at 2; Tr. at 273. Again, Mr. Bakaly expressed his displeasure with this quote and its sourcing because he felt that the proximity of the quote to other sensitive information sourced to associates of Mr. Starr made it appear that the latter information also came from him. Tr. at 273. Mr. Bakaly reaffirmed, in his sworn statement, that he did in fact make the quoted remarks to a group of reporters at a breakfast meeting in November 1998 at the Willard Hotel. Gov. Ex. 14 at 5.

58. Later that same day, February 25, 1999, Mr. Bakaly had a second interview with FBI agents, this time with Agents Russell Robinson and Michael Erbach. Tr. at 295–96. In this interview, Agents Robinson and Erbach again reviewed the *Times* article with Mr. Bakaly. Tr. at 301–02. Mr. Bakaly now acknowledged his responsibility for additional statements that were cited to associates of Mr. Starr. Tr. at 303. Mr. Bakaly admitted that he

was a source for the paragraph which stated that "[b]efore taking [the] unprecedented action [of indicting a sitting President], Mr. Starr would be guided by a number of factors, including the impact that an indictment of the President would have on the nation and the Government, said the associates and others with whom Mr. Starr has discussed the matter." Gov. Ex. 13 at 1 (copy of the *Times* article containing handwritten, numbered paragraphs that Agents Robinson and Erbach used when they interviewed Mr. Bakaly). Mr. Bakaly told the FBI agents that he provided Mr. Van Natta with the information found in that paragraph. Tr. at 304. Mr. Bakaly reaffirmed that he was a source for this information in his sworn statement by acknowledging that "[d]uring our multiple conversations, I discussed with Mr. Van Natta the fact that Mr. Starr would take into account the impact that such an indictment would have on the government process." Gov. Ex. 14 at 2.

59. Mr. Bakaly further conceded that he was a source for the next paragraph of the *Times* article stating that "[t]he associates [of Mr. Starr] say that Mr. Starr agrees with the conclusion of his office's two constitutional law scholars, who say that the Constitution and legal precedent provide a prosecutor with the authority to seek the indictment, trial and conviction of a sitting President." Gov. Ex. 13 at 1. With regard to this paragraph, Mr. Bakaly told the FBI agents that he had discussed with the reporter the fact that "the OIC utilized two constitutional law scholars, being Mr. Rotunda and Mr. William Kelley, and that they provided advice to the OIC, and that Mr. Kelley was close to Mr. Starr." In his sworn statement, Mr. Bakaly again acknowledges that he told Mr. Van Natta that "Judge Starr relies quite a bit on Professor Kelley's advice" and that Professor Rotunda has publicly stated his view that a sitting President can be indicted. The Court finds no evidence in the record, however, that Mr. Bakaly directly confirmed to the reporter that Independent Counsel Starr agrees with the view of

these academic consultants that a sitting President can be indicted. Rather, such confirmation must be inferred from Mr. Bakaly's statements regarding the Independent Counsel's reliance on Professor Kelley.

60. In addition, several paragraphs in the *Times* article relate to OIC internal discussions and analysis of the debates of the Watergate prosecutors. *See* Gov. Ex. 13 at ¶¶ 9, 35–42. It is undisputed that Mr. Bakaly was a source for much of this historical analysis, a fact which he readily acknowledged to the Court when he filed his declaration. *See* Bakaly Declaration at ¶ 9 ("In an effort to divert Mr. Van Natta's focus from speculating on possible OIC actions, and to provide him with historical information he also was seeking, I provided him with a compilation and summary of excerpts from the Watergate Special Prosecution Force Report and from books written by Leon Jaworski (The Right and the Power) and James Doyle (Not Above the Law).") It is worth analyzing the relationship between the redacted Bates Memorandum and the *Times* article in detail because some historical statements contained in the memorandum found their way into the *Times* article and were misleadingly attributed to "associates of Mr. Starr."

61. The relevant passages from the redacted Bates Memorandum state that:

According to the Watergate Special Prosecution Force report:

"This view held that *a failure to indict the incumbent President, in the face of evidence of his criminal activity, would seriously impair the integrity of the criminal process.* Such impairment would be all the more severe because the President was the very man in whom the Constitution reposes the final obligation to ensure that the law is obeyed and enforced, and because his actions appeared to have been designed to place himself and other individuals beyond the reach of the law." (Water-

gate Special Prosecution Force [WSPF], *Report* 122 (1975)).

*Prosecutors should pay no heed to considerations of national interest.* One prosecutor argued: "If we have that power and authority [to indict a sitting President], and we agree that we have sufficient evidence, *we have a duty to act without regard for external factors. It is not for us to weigh the 'political' effects ....*" (James Doyle, *Not Above the Law* 273 (1977) (quoting Carl Feldbaum)).

. . . .

The uncertain state of the law and *the risk that the Supreme Court ultimately would strike down an indictment.*

. . . .

The office [of the WSPF] was obliged to consider *the impact on the nation.* (Doyle, *Not Above the Law* 277).

Gov. Ex. 7 at 1–2. The underlined statements from the redacted Bates Memorandum appeared, word for word, in the *Times* article as follows:

> In their talks, the lawyers in Mr. Starr's office have cited the arguments made in the Watergate era in their deliberations about whether to proceed with such drastic action, associates of Mr. Starr said.
>
> Those in favor have cited a view held by some prosecutors in Mr. Jaworski's office that "*a failure to indict the incumbent President, in the face of evidence of his criminal activity, would seriously impair the integrity of the*

*criminal process,*" an associate of Mr. Starr said.

> Another argument in favor is that "*prosecutors should pay no heed to considerations of national interest,*" an associate of Mr. Starr said. As a prosecutor in Mr. Jaworski's office said in 1974: "*We have a duty to act without regard for external factors. It is not for us to weigh the political effects.*"
>
> But several of Mr. Starr's prosecutors have also said that the Nixon-era prosecutors considered both *the risk that the Supreme Court would ultimately strike down an indictment* and *the impact on the nation.*

Gov. Ex. 1 at 2. Any fair reading of the *Times* article suggests that Mr. Van Natta is quoting unnamed "associates of Mr. Starr" in at least three of the above underlined passages. Yet a comparison with the redacted Bates Memorandum convincingly demonstrates that these precise quotes actually come verbatim from historical materials and, in the Bates Memorandum, these statements are cited to Watergate era sources.[3] Therefore, the Court concludes that Mr. Bakaly provided Mr. Van Natta with most of the information found in the *Times* article that is characterized as an internal OIC debate on precedent from the Watergate era.

62. Paragraphs 15 through 17 of the *Times* article discuss the four options that the Independent Counsel could consider regarding the potential indictment of the President. Gov. Ex. 13 at 1. As the Court has concluded, Mr. Bakaly confirmed for

---

**3.** This aspect of the evidence presented at trial is deeply disturbing. As the foregoing comparison demonstrates, Mr. Bakaly has made a persuasive showing that historical debates and quotes were lifted verbatim out of the Bates Memorandum and falsely described as present day debates within the OIC. The misimpression that this journalistic sleight of hand produced is quite troubling for what it shows about the reliability of anonymously attributed information. More important for the purpose of the present inquiry, the fraudulent attribution of historical information to present day members of the OIC could have had an impact on the Court's determination of the second prong of the *Barry* test, i.e., whether the OIC should be held to answer, under the penalty of contempt of court, for possibly leaking information that may include matters occurring before the grand jury. At the *prima facie* stage of inquiry, the Court often has no evidence that goes beyond the attribution on the face of the article. The use of the redacted Bates Memorandum in the *Times* article demonstrates how easily the parties and a court can be led astray by an inaccurate and misleading attribution.

Mr. Van Natta that these were indeed the prosecutive options available to the OIC and he discussed these options with the reporter. *See supra* ¶ 39. Thus, the Court finds that Mr. Bakaly is a source or an "associate" of Mr. Starr with regard to the description in the *Times* article of the four indictment options.

63. The next paragraph of the *Times* article states that:

Mr. Starr's associates said that neither the outcome of the Senate trial nor the public's wishes expressed in opinion polls would affect his decision. "Prosecutors do not take polls to decide what to do," another associate of Mr. Starr said. "Ken has proven he is immune to polls."

Gov. Ex. 13 at 1. In his February 25th interview with Agent Lewis and in his sworn statement of the next day, Mr. Bakaly acknowledged that he is a source for these statements regarding the effect of public opinion on the Independent Counsel's decisions. *See supra* ¶ 56. Thus, the Court finds Mr. Bakaly was the source for these statements on the influence of public opinion.

64. Paragraph 28 concerns some of the most sensitive and confidential information disclosed in the *Times* article. This paragraph states that:

Inside the Independent Counsel's Office, a group of prosecutors believes that not long after the Senate trial concludes, Mr. Starr should ask the grand jury of 23 men and women hearing the case against Mr. Clinton to indict him on charges of perjury and obstruction of justice, the associates said. The group wants to charge Mr. Clinton with lying under oath in his Jones deposition in January 1998 and in his grand jury testimony in August, the associates added.

Gov. Ex. 13 at 2. This passage of the *Times* article contains one of the three pieces of information that Mr. Van Natta mentioned to Mr. Bakaly at their January 21st meeting and represented as coming from sources outside the OIC, namely that a group of prosecutors within the OIC believe that an indictment of the President should be sought shortly after the Senate trial. As explained in detail above, Mr. Bakaly told the FBI in his sworn statement that he may have "inadvertently confirmed these facts by not explicitly denying them." *See supra* ¶ 35. The Court finds that Mr. Bakaly was a confirming source of this information through his ongoing discussions with Mr. Van Natta, even if his confirmation was, as he claims, "inadvertent." However, the Court finds no evidence in the record to support the notion that Mr. Bakaly directly and expressly confirmed this sensitive information.

65. Mr. Bakaly also conceded to Agents Robinson and Erbach that he had discussed with Mr. Van Natta the relative strength of various charges that the President might face. Tr. at 310. Specifically, Mr. Bakaly told Mr. Van Natta that in his opinion a perjury count arising from the President's deposition in the Jones lawsuit was a stronger charge than the impeachment case that was being tried in the Senate. Tr. at 310. Based on his discussion with Mr. Van Natta regarding the relative merits of the charges, Mr. Bakaly informed the agents that he might be a source for the paragraph that references the charges that the OIC might pursue. Tr. at 311. Mr. Bakaly discussed these sensitive matters with Mr. Van Natta because he wanted to get the message out to the public so that in the event of a Senate acquittal of the President, the OIC could still proceed with its prosecution of possibly stronger charges. Tr. at 311. There is, however, no mention in the *Times* article itself of the view of an "associate of Mr. Starr" regarding the relative merits of charges. Gov. Ex. 1. Therefore, the Court is unable to find that this discussion led directly to any specific disclosures in the *Times* article.

66. The last two paragraphs of the *Times* article state that:

Several times since the President's Senate trial began on Jan. 6, [the President's attorney] has argued that the proper forum to try Mr. Clinton on charges of perjury and obstruction of justice is a criminal courtroom.

"Those comments are seen by some in the office as an invitation," one associate of Mr. Starr said.

Gov. Ex. 13 at 2. Mr. Bakaly acknowledged to Agents Robinson and Erbach that he was again the unnamed associate of Mr. Starr who was quoted in the last paragraph of the article. Tr. at 312. He reaffirmed that he was the source for this quote in his sworn statement, admitting that "[t]he article reflects nearly a direct quote of what I said [to Mr. Van Natta]." Gov. Ex. 14 at 7. Still, Mr. Bakaly has consistently maintained that he did not use the words "in the office" when he spoke with Mr. Van Natta. Tr. at 312–13, 466; *see also* Gov. Ex. 14 at 6–7 ("I did not say that our office felt that way."). Rather, Mr. Bakaly claims that he simply told the reporter that some people may take the comments of the President's attorney as an invitation to prosecute, stridently protesting that he never represented that this was the view of the OIC. Tr. at 466. While accepting his protestation that he did not specifically state that the OIC viewed these comments as an invitation, the Court nevertheless finds that Mr. Bakaly was properly understood as expressing the opinion of the OIC when he made these comments to a reporter in his official capacity as media spokesperson for the OIC. Thus, the Court concludes that Mr. Bakaly was also the source for this quote in the *Times* article.

67. After speaking to the FBI agents and reviewing Mr. Bakaly's sworn statement, Mr. Bucklin determined that Mr. Bakaly was now providing new and contradictory statements regarding the sources of information for disclosures contained in the *Times* article. Tr. at 82. As a result, Mr. Bucklin concluded that the OIC needed to disclaim its reliance on the Bakaly

declaration and withdraw its argument that it was not the source of these disclosures. Tr. at 82. On March 8, 1999, the OIC filed its "Amendment to the Opposition of the OIC to the Motion for an Order to Show Cause and Withdrawal of Argument and Supporting Declaration," formally withdrawing the argument that the OIC was not the source of certain sensitive disclosures and disavowing any reliance on the Bakaly declaration. Gov. Ex. 15 at 2.

68. Having found that the foregoing facts have been proved beyond a reasonable doubt, the Court will now evaluate these facts in light of the governing legal standard in order to determine whether the Government has proved its charges of criminal contempt.

### III. CONCLUSIONS OF LAW

69. The criminal contempt statute under which Mr. Bakaly is charged provides that "[a] court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as ... [m]isbehavior of any person in its presence or so near thereto as to obstruct the administration of justice." 18 U.S.C. § 401(1).

70. A conviction under Section 401(1) requires proof beyond a reasonable doubt of four elements: 1) misbehavior of a person, 2) in or near to the presence of the court, 3) which obstructs the administration of justice, and 4) which is committed with the required degree of criminal intent. *See United States v. McGainey*, 37 F.3d 682, 684 (D.C.Cir.1994).

71. Making false statements to a court constitutes "misbehavior" that is punishable as contempt, so long as the other elements of the contempt statute are satisfied. *See In re Michael*, 326 U.S. 224, 66 S.Ct. 78, 90 L.Ed. 30 (1945); *Ex Parte Hudgings*, 249 U.S. 378, 39 S.Ct. 337, 63 L.Ed. 656 (1919).

72. To support a determination of criminal contempt for making a false

statement, the Government must prove, beyond a reasonable doubt, that the relevant statement meets "the essential elements of perjury under the general law." *In re Michael,* 326 U.S. at 227–28, 66 S.Ct. 78; *see also United States v. Dunnigan,* 507 U.S. 87, 93, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993). To satisfy the elements of perjury, the Government must prove, beyond a reasonable doubt, that: 1) Mr. Bakaly made a false statement to the Court "that he did not, at the time, believe ... to be true," *Young v. United States,* 212 F.2d 236, 240 (D.C.Cir.1954); and 2) that the statement is material to the issue to be determined by the Court. *See In re Sealed Case,* 162 F.3d 670, 673 (D.C.Cir. 1998); *Weinstock v. United States,* 231 F.2d 699, 701–02 (D.C.Cir.1956). With regard to the first element, it is firmly established that a statement that is literally true may not form the basis for a perjury prosecution—even if the statement is incomplete, intentionally misleading or "misleading by negative implication." *Bronston v. United States,* 409 U.S. 352, 353, 359–60, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973). The Court finds that the Government did not prove beyond a reasonable doubt that the statements of Mr. Bakaly met the elements of perjury.

73. The Court will now consider Mr. Bakaly's allegedly false statements in light of the strict legal standard required for a finding of perjury:

74. *Count 1:* In paragraph 12(a) of its Amended Rule 42(b) Notice, the Government charges Mr. Bakaly with making the following materially false and misleading statement in his declaration to the Court:

> "I next recall a conversation with Mr. Van Natta on this subject on or about January 21, 1999. This occurred just a few days after an article by Jill Abramson appeared in the *New York Times.* Ms. Abramson's article addressed possible trials of the President and others after the conclusion of the Senate impeachment proceeding. A copy of Ms. Abramson's article is attached hereto at

Tab 2. ***Consistent with the position I took with Mr. Van Natta, I declined to discuss non-public matters with Ms. Abramson,*** and her article stated: 'Charles G. Bakaly, 3d, a spokesman for the Independent Counsel's Office, would not comment on any indictment speculation ...' "

Amended Rule 42(b) Notice at ¶ 12(a) (quoting Bakaly Declaration, ¶ 6 at 2). The allegedly false statement is underlined and in bold. The Government claims that Mr. Bakaly knew that this statement was false because he did, in fact, discuss four specific non-public matters with Mr. Van Natta: 1) confirming four options regarding the possible indictment of the President; 2) that a perjury count based on the deposition given in the Jones lawsuit was a stronger case than the perjury count being tried in the Senate; 3) that Professor Rotunda is not in the office very much and that Mr. Udolf left the office in April or May, 1998, and may be biased against the OIC; and 4) that Judge Starr relies quite a bit on Professor Kelley's advice. Amended Rule 42(b) Notice at ¶ 12(a). In order to prove this charge beyond a reasonable doubt, the Government is required to demonstrate that Mr. Bakaly did in fact discuss material, "non-public" matters with Mr. Van Natta at their January 21, 1999, meeting.

75. First, the Government alleges that Mr. Bakaly confirmed for Mr. Van Natta the four options regarding the possible indictment of the President. While the Court finds that Mr. Bakaly did confirm and discuss with Mr. Van Natta that these were indeed four options regarding indictment of the President that were available to the OIC, the Government has not proven that these discussions delved into the OIC's internal, "non-public" deliberation of these options. *See supra* ¶ 39. The Court finds that the four options, in and of themselves, are not "non-public" information. Tr. at 242 (testimony of Agent Erbach agreeing that these choices represent the "garden-variety" options available to pros-

ecutors). However, it clearly was "non-public" and highly sensitive information that the OIC had held an all-attorneys meeting on January 27, 1999, to discuss these options. Although Mr. Van Natta may have assumed that Mr. Bakaly's confirmation of the four options was an indication that they were presently and actively under consideration by the OIC, the Government has not proven beyond a reasonable doubt that Mr. Bakaly discussed or acknowledged the OIC's internal deliberations of these options. Thus, Mr. Bakaly's statement in ¶ 6 of his declaration that he "declined to discuss non-public matters" is accurate. Even though the Court finds that Mr. Bakaly was an "associate" of Mr. Starr who discussed the four indictment options with Mr. Van Natta, the Court is unable to conclude that he thereby discussed "non-public" matters with the reporter.

76. Moreover, there is a temporal problem with the Government's reliance on the discussion of the four indictment options as proof that Mr. Bakaly discussed "non-public" matters with Mr. Van Natta on January 21, 1999. The evidence in the record suggests that Mr. Bakaly and Mr. Van Natta did not discuss the four options until their meeting on January 28, 1999, the day after the all-attorneys meeting on these options. *See supra* ¶¶ 38–39. Even if the Government could prove that Mr. Bakaly and Mr. Van Natta discussed the four indictment options at their January 21st meeting, it would be difficult to claim that such discussions, prior to the January 27th all-attorneys meeting, disclosed "non-public" matters to the reporter.

■ 77. Second, the government alleges that Mr. Bakaly discussed non-public matters with Mr. Van Natta through his comment that a perjury count based on the deposition given in the Jones lawsuit was a stronger case than the perjury count being tried in the Senate. While the Court finds that Mr. Bakaly discussed his opinion of the relative strengths of the charges, *see supra* ¶ 65, no comparison of

this nature is actually contained in the *Times* article. Therefore, it could not comprise one of the alleged grand jury leaks that the movants complained of in their motion to show cause. As such, Mr. Bakaly's discussion with Mr. Van Natta is immaterial to that motion. Any discussion of immaterial, "non-public" matters cannot properly prove the criminal contempt charge against Mr. Bakaly.

78. Third, the Government alleges that the statement in paragraph 6 of the Bakaly declaration is false because Mr. Bakaly informed Mr. Van Natta that Professor Rotunda is not often in the office and that Mr. Udolf left the office and may be biased against the OIC. Although the Court has found that Mr. Bakaly made these statements to Mr. Van Natta, *see supra* ¶ 33, it is not apparent how these comments disclose material, "non-public" matters. At most, these comments are simply an attempt by Mr. Bakaly to cast doubt on what these particular sources may be telling Mr. Van Natta. They do not prove that Mr. Bakaly's specific statement that he declined to discuss non-public matters with Mr. Van Natta is false.

■ 79. Finally, the Government charges that Mr. Bakaly's statement is false because he told Mr. Van Natta that Judge Starr relies quite a bit on Professor Kelley's advice. While the Court finds that Mr. Bakaly did indeed make this comment to Mr. Van Natta, *see supra* ¶ 59, this statement, in and of itself, provides a very slim basis for a criminal contempt conviction. In order to attach significance to this information, the reporter is required to infer that this reliance on Professor Kelley's advice confirms that Independent Counsel Starr has concluded that he has the authority to indict a sitting President. Even though the Court concurs with the Government's argument that Mr. Bakaly was clearly trying to suggest to the reporter this unspoken piece of sensitive and "non-public" information, the Court is not willing to conclude that Mr. Bakaly's inferential message is identical to

stating directly that the Independent Counsel has concluded that he has the authority to indict the President. While, in certain circumstances, a wink and a nod are unquestionably tantamount to outright confirmation, the Court is unwilling to base a criminal conviction on Mr. Bakaly's unelaborated hint to Mr. Van Natta.

80. *Count 2:* In paragraph 12(b) of its Amended Rule 42(b) Notice, the Government charges Mr. Bakaly with making the following materially false and misleading statement in his declaration to the Court:

> "I cautioned Mr. Van Natta that he should not rely on information from outside sources purporting to know what was going on inside the OIC. I noted that people often overstate their knowledge as well as their own importance. In an effort to steer Mr. Van Natta away from an inaccurate report, I suggested that Judge Starr was himself a constitutional scholar and would not be swayed by any one person or recent event. *I refused to confirm or comment on what Judge Starr or the OIC was thinking or doing.* I agreed to provide an on-the-record quote, which appeared in Mr. Van Natta's article: 'We will not discuss the plans of this office or the plans of the grand jury in any way, shape or form.'"

Amended Rule 42(b) Notice at ¶ 12(b) (quoting Bakaly Declaration, ¶ 8 at 3).

81. First, the Government claims that Mr. Bakaly knew that this statement was false because he did, in fact, discuss with Mr. Van Natta what Judge Starr or the OIC was thinking or doing in three specific ways: 1) confirming four options regarding the possible indictment of President Clinton; 2) discussing internal OIC matters in an attempt to influence Mr. Van Natta to write the article in a way that would "protect the office"; and 3) telling Mr. Van Natta that a perjury count based on the deposition given in the Jones lawsuit was a stronger case than the perjury count being tried in the Senate. *See* Amended Rule 42(b) Notice at ¶ 12(b).

82. For the same reasons stated above, the Court is unable to find that Mr. Bakaly's discussion of the four indictment options included confirmation or comment on any deliberations or actions of Independent Counsel Starr or the OIC. *See supra* ¶ 75. While Mr. Bakaly has acknowledged discussing these prosecutorial options with Mr. Van Natta, the Government has not proven beyond a reasonable doubt that these discussions directly confirmed or commented on the January 27th all-attorneys meeting or any other internal deliberations.

■ 83. Second, the Government contends that the statement in paragraph 8 of his declaration was false because Mr. Bakaly did "confirm or comment on what Judge Starr or the OIC was thinking or doing" when he discussed "internal OIC matters with Mr. Van Natta." Aside from the discussion of the four indictment options, the other discussions between Mr. Bakaly and Mr. Van Natta of potentially internal OIC matters relate to Mr. Bakaly's "inadvertent" confirmation of two pieces of information that Mr. Van Natta raised at their January 21, 1999, meeting—that Independent Counsel Starr had recently come to the conclusion that a president could be indicted and that certain members of the OIC were arguing that the President should be indicted after the Senate impeachment trial concluded. *See supra* ¶ 35. Mr. Bakaly's admission that he may have inadvertently confirmed this highly sensitive and confidential information is particularly troubling because this information goes to the heart of the disclosures that President Clinton and the White House complained about in their motion to show cause. Thus, these disclosures were clearly material and were squarely placed before the Court. Furthermore, there is no question that Mr. Bakaly, in paragraph 8 of his declaration, flatly denied that he had confirmed this information.

84. Still, the Court finds that the Government falls short of proving the falsity of Mr. Bakaly's statement beyond a reasonable doubt. As noted in the findings of fact, the Court is unable to conclude that Mr. Bakaly directly confirmed this sensitive information by stating that it could only come from within the OIC. *See supra* ¶ 34. In his sworn statement, Mr. Bakaly concedes that "I tried to talk [Mr. Van Natta] away from [his information that a group of lawyers in the OIC thought the President should be indicted at the conclusion of the Senate trial] and may have inadvertently confirmed these facts by not explicitly denying them. I felt it was inappropriate for me to confirm, deny, or comment on that information." Gov. Ex. 14 at 5. Based on this admission and the relevant testimony of the FBI agents, the Court finds that Mr. Bakaly's ongoing discussions with Mr. Van Natta about these matters led the reporter to conclude that his information was accurate and consistent with internal OIC sources. *See supra* ¶ 35. As an experienced and savvy media spokesman, *see* Tr. at 450–53, it is very difficult for Mr. Bakaly to credibly claim complete innocence for "inadvertent" confirmation of such sensitive information. Yet the Court is unable to find that the Government has proven beyond a reasonable doubt that Mr. Bakaly intentionally confirmed this information in any concrete manner. As the Supreme Court has established, a statement that is literally true may not form the basis for a perjury prosecution—even if the statement is incomplete, intentionally misleading or "misleading by negative implication." *Bronston,* 409 U.S. at 353, 359–60, 93 S.Ct. 595. Therefore, the Court cannot hold, with the precision required for a perjury conviction, that Mr. Bakaly's statement to the Court that he "refused to confirm or comment on what Judge Starr or the OIC was thinking or doing" has been proved false beyond a reasonable doubt.

85. For the same reasons stated above, the Court finds that Mr. Bakaly's discussion of the relative merits of the counts that the President might face is not material to the inquiry that was before the Court and, therefore, cannot properly form the basis for a criminal contempt conviction. *See supra* ¶ 77.

86. *Count 3:* In paragraph 12(c) of its Amended Rule 42(b) Notice, the Government charges Mr. Bakaly with making the following materially false and misleading statement in his declaration to the Court:

"During a conversation with Mr. Van Natta on either January 28 or 30, 1999, it became apparent that he was going to proceed with the article. I expressed my concerns over how he intended to source the information that he described to me as coming from outside the OIC. I feared that information about the purported views of Judge Starr and some group within the OIC would be perceived as originating from within in [sic] the Office. *Mr. Van Natta again assured me that his sources were outside the OIC, that he was 'working on his sourcing' and that he intended to make it clear in his article that his sources were not within the OIC.* I also expressed concern over the timing of his article during the Senate impeachment trial— and that the OIC would once again be unfairly criticized for interfering in the Senate's business. Mr. Van Natta said that he had not thought of that as an issue."

Amended Rule 42(b) Notice at ¶ 12(c) (quoting Bakaly Declaration, ¶ 11 at 3–4). The Government claims that Mr. Bakaly knew that this statement was false because he was, in fact, the source of some information attributed to an associate or associates of Judge Starr. Moreover, the Government asserts Mr. Bakaly would not have been told by Mr. Van Natta that Mr. Van Natta's sources were outside the OIC. Amended Rule 42(b) Notice at ¶ 12(c).

■ 87. As the Court demonstrated in its findings of fact, the Government is correct in contending that Mr. Bakaly was a source, or the source, for much of Mr. Van

Natta's article. *See supra* ¶¶ 55–66. However, the Government misinterprets Mr. Bakaly's statement in his declaration. It is overly broad to read the statement in Mr. Bakaly's declaration as denying that he was a source at all for Mr. Van Natta. To the contrary, Mr. Bakaly acknowledged speaking with Mr. Van Natta as he was working on the article and providing the reporter with certain materials, such as the redacted Bates Memorandum and Independent Counsel Starr's testimony before the House Judiciary Committee. Thus, a fair reading of this statement limits it to "information about the purported views of Judge Starr and some group within the OIC." Bakaly Declaration at ¶ 11. It is clear that the "information" referred to is contained in paragraph 7 of the declaration, namely that Mr. Van Natta told Mr. Bakaly "that [Mr. Van Natta] had learned that Judge Starr had recently been convinced that he could indict the President while in office, and that a group within the OIC believed the President should be indicted." For the same reasons stated in detail above, the Court is unable to find, with the precision required for a perjury conviction, that Mr. Bakaly intentionally confirmed this information in any concrete manner. *See supra* ¶¶ 83–84. Thus, the Court cannot hold that Mr. Bakaly's statement to the Court that "Mr. Van Natta again assured me that his sources were outside the OIC, that he was 'working on his sourcing' and that he intended to make it clear in his article that his sources were not within the OIC" has been proved false beyond a reasonable doubt.

88. *Count 4:* In paragraph 13 of its Amended Rule 42(b) Notice, the Government charges Mr. Bakaly with knowingly causing the following materially false and misleading statements and representations to appear in the OIC's opposition brief that was filed with the Court:

"Mr. Bakaly declined to provide Mr. Van Natta with any information about OIC intentions, noting only that several other reporters had already written on the subject or were working on similar stories."

"In a subsequent conversation prior to the article's publication, Mr. Van Natta advised Mr. Bakaly that he had learned that Mr. Starr recently had been convinced that a sitting President could be indicted. Mr. Van Natta also told Mr. Bakaly that he was aware that a group of OIC prosecutors felt that the President should be indicted. *Mr. Van Natta further told Mr. Bakaly that all his information came from sources 'outside' the OIC.*

Mr. Bakaly refused to confirm the information that Mr. Van Natta already possessed."

Amended Rule 42(b) Notice at ¶ 13 (quoting OIC Opposition Brief at 12–13). The Government claims that Mr. Bakaly caused these false statements and representations to be made by his "knowing failure to disclose material information to Bucklin, Cohen, and OIC personnel regarding his disclosures to Van Natta." *Id.*

89. Indeed, one of the sentences at issue, when read in isolation, contains the sweeping assertion that "Mr. Van Natta further told Mr. Bakaly that all his information came from sources 'outside' the OIC." Gov. Ex. 4 at 13. This statement seems to suggest by negative implication that Mr. Bakaly was not a source to Mr. Van Natta. However, in his declaration and in the rest of the argument found in the opposition brief, Mr. Bakaly acknowledges providing certain information to Mr. Van Natta. Therefore, this sentence must be taken in context as limited to the two sensitive, "non-public" pieces of information outlined in the preceding sentences of that paragraph in his declaration, namely that Independent Counsel Starr had recently concluded that a sitting President could be indicted and that a group of OIC prosecutors felt that the President should be indicted. *Id.; see also* Tr. at 166 (testimony of Mr. Bucklin agreeing that this broad assertion is properly read to relate

only to these two non-public items of information). As such, any suggestion that this statement implies a blanket denial that Mr. Bakaly was not a source can only be based on an imprecise reading of this argument in the OIC's opposition brief. Thus, the Court finds that the relevant statements made in the OIC's opposition brief and supported by the Bakaly declaration are properly limited to a denial that Mr. Bakaly gave Mr. Van Natta any information pertaining to the Independent Counsel's thinking or the OIC's deliberations regarding the indictment of the President.

90. When read in this manner, the denials of disclosure and confirmation contained in the OIC opposition brief are essentially the same denials that Mr. Bakaly made in paragraphs 8 and 11 of his declaration. As the Court has already found that those statements were actually accurate, the Court is once again unable to conclude that Mr. Bakaly intentionally confirmed the sensitive internal deliberations of the OIC in any concrete manner. *See supra* ¶¶ 83–84. Therefore, the Government has not proved, with the precision required for a perjury conviction, that the relevant statements and representations made in the OIC's opposition brief, based on the Bakaly declaration and Mr. Bakaly's interview with outside counsel for the OIC, are false beyond a reasonable doubt.

91. Even though the Government has not proved beyond a reasonable doubt that any of the specific statements contained in the Government's charges are inaccurate, it is clear that Mr. Bakaly's declaration was, at best, misleading. The declaration was submitted to the Court for the express purpose of rebutting the attribution prong of the *Barry* test and the clear, if unstated, implication was that neither Mr. Bakaly nor any member of the OIC were "associates of Mr. Starr." The Bakaly declaration was designed to broadly inform the Court that Mr. Van Natta had told Mr. Bakaly that all of the reporter's sources for sensitive, internal OIC information came from outside the OIC. As the findings of fact demonstrate, Mr. Bakaly was in fact the direct source or at least a confirming source for much of the information found in the *Times* article, including confirmation, even if "inadvertent," of certain sensitive, internal deliberations.

92. When the final version of the article was seen, Mr. Bakaly realized that he had played a very risky game of journalistic cat and mouse with Mr. Van Natta and that he had gotten "burned" because the information contained in the article was too closely tied to OIC sources or "associates of Mr. Starr." Realizing how involved he was as a source for Mr. Van Natta, Mr. Bakaly chose not to give full and detailed information to OIC outside counsel. He offered carefully parsed words that led the OIC to file a misleading declaration and argument in its opposition brief. When this fact became apparent to Mr. Bucklin, he had no choice but to withdraw the attribution argument and the declaration upon which it was based. It is clear that Mr. Bakaly misled Mr. Bucklin when he asserted he was not an "associate" cited in the article, beyond the few instances that Mr. Bakaly disclosed. Mr. Bakaly also misled his OIC colleague and FBI liaison, Mr. Wisenberg, by making the same assertion. As the FBI investigation came to focus on his conversations with Mr. Van Natta, Mr. Bakaly was more forthcoming regarding the extent of his involvement and even expressed his grave concern that he would be disbarred and prosecuted for his conduct in this matter. Tr. at 275. Given the vast gulf between what he had originally acknowledged to Mr. Bucklin and what he ultimately admitted to the FBI, it is not surprising that Mr. Bucklin came to believe that the declaration was false.

93. However, Mr. Bakaly is not charged with lying to OIC outside counsel or lying to his fellow OIC members. Rather, the charges of criminal contempt allege that he directly lied to the Court by making false or perjurious statements. In

**34**

the face of these charges, the Court is constrained to solely consider the strict accuracy of his statements. Towards this end, Mr. Bakaly revised the declaration to limit the sweep of his assertions to the Court, thereby, making it more accurate and evincing some intent to provide a strictly truthful declaration.

94. Moreover, even if some of his statements are misleading by their negative implication that Mr. Bakaly was not a source of information that he in fact supplied or confirmed, such a finding does not provide a sufficient basis for a criminal contempt conviction for making false statements. As the Court cannot find that the Government has proved beyond a reasonable doubt that any of the charged statements, when read in the proper context, are inaccurate, the Court is unable to find Mr. Bakaly guilty of the charges of criminal contempt as set forth in the Amended Rule 42(b) Notice.

For all of the foregoing reasons, the Court finds Mr. Bakaly not guilty of the charges of criminal contempt and discharges its March 25, 1999, Order to Show Cause. An appropriate Judgment accompanies this Memorandum Opinion.